**ANDERSEN CONSULTING, Appellant,**

v.

**The UNITED STATES, Appellee,**

**and**

**Computer Sciences Corporation, Intervenor.**

No. 91–1237.

United States Court of Appeals, Federal Circuit.

March 17, 1992.

William A. Bradford, Jr., Hogan & Hartson, Washington, D.C., argued for appellant. With him on the brief was Douglas R. Duberstein.

Catherine A. Christman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. On the brief were Stuart M. Gerson, Asst. Atty. Gen. and David M. Cohen, Director, Dept. of Justice, Washington, D.C. Also Ingrid D. Falanga and Daniel J. Mazella, Financial Management Service, Dept. of Treasury, of counsel. Joan M. Bernott, Dept. of Justice, Washington, D.C., represents appellee.

James J. Regan, Crowell & Moring, Washington, D.C., argued for intervenor Computer Sciences Corp. With him on the brief was Robert M. Halperin.

Before MAYER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and LOURIE, Circuit Judge.

MAYER, Circuit Judge.

Andersen Consulting appeals the decision of the General Services Administration Board of Contract Appeals denying its protest of an award by the Department of Treasury to Computer Sciences Corporation for the development of an automatic data processing system. GSBCA No. 10833–P, 91–1 B.C.A. (CCH) ¶ 23,474 (1990). We affirm.

### Background

Through the Financial Management Service (FMS), the Treasury Department issued solicitation RFP–FMS–89–0005 on March 15, 1989. FMS is the arm of Treasury responsible for processing the federal government's financial transactions and, in this role, it manages a daily cash flow that averages $7 billion. The solicitation was part of FMS's System 90 project aimed at upgrading and replacing its current computer capabilities. Specifically, the request for proposal (RFP) sought to acquire hardware, software, operations support, and software development of a new Payments, Claims, and Enhanced Reconciliation system (PACER).

The relevant provisions of the RFP were as follows. Before submitting their initial proposals, all bidders were required to run their hardware and software through an unwitnessed performance benchmark simulating FMS's workload. The results were to be submitted with their proposals. The hardware and software used in the benchmark were required to be identical to those

listed in the initial proposal. The bidders would resubmit their benchmark results with their best and final offers (BAFOs) as long as there were no changes in the proposed software between the initial proposal and the BAFO. If the bidders wanted to offer different software in their BAFO, they would have to run another benchmark. When FMS selected an apparent awardee after the BAFOs were in hand, the apparent awardee would be required to rerun the benchmark with government witnesses to validate the results of the first one.

The RFP permitted bidders to propose either new or reconditioned hardware as long as the reconditioned equipment performed and carried the same warrantee as if it were new. The RFP required that the most current releases of software be proposed and that all software be commercially available as of the date of submission of BAFOs. The RFP defined commercial availability as:

> Hardware and software products that: 1) are available for sale and delivery to Government and commercial customers as of the date of submission of Best and Final Offers (BAFOs), 2) require no further development, and 3) have been fully tested and demonstrated in the commercial or Government marketplace to meet the requirements of this solicitation.

Lastly, the proposals were to be GOSIP compliant. This required that a Communications Interface Solution (CIS) be proposed which would provide interconnectivity with Government Open Systems Interconnection Profile (GOSIP) compliant networks. In this way, the new System 90 would be able to interact with other computer systems. At a minimum, to be GOSIP compliant the proposed software was required to "support" File Transfer Access Management (FTAM) protocol, X.400 (a messaging protocol), and Virtual Terminal Protocol (VTP).

The solicitation stated that the award would be granted to "the offeror whose overall proposal offers the greatest value and most advantages to the Government." The technical proposals would be point scored and although the scores were to be given greater weight than cost, as they approached equality, cost would become a more discriminating factor. Three companies bid: Andersen Consulting, Computer Sciences Corporation (CSC), and Grumman Data Systems. CSC's technical scores ranked slightly above Andersen's and slightly below Grumman's, but CSC's evaluated price was substantially lower than either Andersen's or Grumman's. Because of the significant disparity in prices, FMS hired Cincinnati Bell Information Systems to independently analyze CSC's cost estimate. Both Cincinnati Bell and FMS concluded that the savings resulted from CSC proposing the use of reconditioned, rather than new, hardware. Andersen proposed only new hardware. FMS awarded the contract to CSC.

On appeal to the board, Andersen alleged that FMS's discussions with it were defective because FMS did not inform it of "points of weakness" in its proposal; FMS engaged in improper post-BAFO discussions with CSC; FMS's price realism analysis of CSC's BAFO was faulty; four software products offered by CSC were not in fact "commercially available" at the time BAFOs were submitted; requirements for GOSIP compliance were not met by CSC; and both of CSC's benchmarks were defective. From these allegations, the board found three errors in the procurement: (1) at the time FMS awarded the contract, it believed the software product CA–Datacom/PC to be commercially available, when in fact it was not; (2) FMS did not require CSC to run a second unwitnessed benchmark even though its proposal changed between the initial proposals and its BAFO; and (3) prior to the government-witnessed benchmark, CSC had not prepared the capability to upload the software product Ideal/Escort to the mainframe code. 91–1 B.C.A. (CCH) at 117,759.

On the first error, the board stated that CA–Datacom/PC met two of the three tests for commercial availability, that CA–Datacom/PC was a very small part of the contract, and that Andersen had not alleged any problems with the software or that it would have fared better if it also

had been permitted to introduce software not commercially available. Second, "the fact that CSC did not rerun the unwitnessed benchmark has been sapped of most significance by the fact that the firm ran a Government-witnessed benchmark with precisely the same configuration of hardware and software that should have been benchmarked previously." *Id.* Third, the uploading utility for Ideal/Escort could likely be developed in a "man-day or less" and therefore was insignificant. *Id.* at 117,760. Before deciding whether to grant the protest, the board cautioned, "Any good lawyer can pick lint off any Government procurement, pundits say. We will not set aside an award, even if violations of law are found, unless those violations have some significance." *Id.* at 117,759. It concluded that the errors just discussed were "simply de minimis violations of law" and therefore the protest was denied. *Id.* Andersen appeals.

### Discussion

◼ Andersen invites us to hold as a matter of law that upon finding any errors in a procurement, no matter how minor, the board is bound to grant a protest. We decline. Andersen also requests that we reverse the board's findings that no improper post-BAFO discussions with CSC occurred, that CSC proposed Ideal/Escort as well as Ideal/PC in its BAFO, that CSC's proposal was GOSIP compliant, and that the price realism analysis was proper. We affirm the board's findings on these issues. Lastly, Andersen accuses the board of "second guessing" the agency in direct violation of our proscription in *Data General Corp. v. United States*, 915 F.2d 1544, 1552 (Fed.Cir.1990). We think the board did just the opposite. We review the board's conclusions of law de novo, but defer to its findings of fact unless unsupported by substantial evidence. 41 U.S.C. § 609(b) (1988); *United States v. DeKonty Corp.*, 922 F.2d 826, 827 (Fed.Cir.1991). The board's interpretations of the applicable regulations deserve some deference because it has expertise in this area from daily exposure. *SMS Data Prods. Group,*

*Inc. v. United States*, 900 F.2d 1553, 1555 (Fed.Cir.1990).

### I.

◼ The Competition in Contracting Act of 1984 (CICA), which governs this case, states:

> If the board determines that a challenged agency action violates a statute or regulation or the conditions of any delegation of procurement authority issued pursuant to this section, the board *may* suspend, revoke, or revise the procurement authority of the Administrator or the Administrator's delegation of procurement authority applicable to the challenged procurement.

40 U.S.C. § 759(f)(5)(B) (1988) (emphasis added). The use of the permissive "may" instead of the mandatory "shall," authorizes the board to employ its discretion in determining how to handle errors in procurement. Furthermore, "[i]n making a decision on the merits of protests brought under this section, the board shall accord due weight to the policies of this section and the goals of economic and efficient procurement set forth in this section." *Id.* § 759(f)(5)(A). From this it follows that the board must consider the significance of errors in procurement when deciding whether to grant a protest because overturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations.

Andersen directs us to the first board decision under the CICA, *Lanier Business Prods., Inc.*, GSBCA No. 7702-P, 85–2 B.C.A. (CCH) ¶ 18,033 (1985), to support its contention that every error requires that a protest be granted. Aside from the fact that *Lanier* is not binding on us, Andersen reads the case incorrectly. The board first noted the "broad discretion" granted it by the CICA when it finds errors in procurement to "suspend, revoke, or revise the procurement authority." *Id.* at 90,496 (quoting 40 U.S.C. § 759(h)(5)(B), since redesignated § 759(f)(5)(B)). Andersen correctly quotes the board as stating that "[a]ll that is required here, is a showing of

a violation," but the board qualified this broad statement by saying, "If a violation is shown, we will exercise our own discretion in ordering the relief authorized by the CICA." *Id.* Contrary to Andersen's interpretation that these statements read together require the board to grant a protest for any violation, and *then* to exercise its discretion in fashioning a remedy, we read the CICA and *Lanier* as authorizing the board to use its discretion in deciding whether to grant a protest or not. If *Lanier* can be read otherwise, it will have to give way.

■ Here, the preparation of CSC's BAFO certainly was not a model. But, we agree with the board that the errors it contained do not support Andersen's protest. We have no quarrel with the board's discussion of the three errors and its determination that they were de minimis. CD–Datacom/PC was a tiny part of the contract and was very close to becoming commercially available; CSC executed the government-witnessed benchmark with all proposed software even though it did not execute a second pre-BAFO benchmark; and the uploading facility for Ideal/Escort may be prepared in less than one man-day. Therefore, we affirm the board's decision that Andersen's protest over the de minimis errors should be denied.

This is not a new principle. In *SMS Data Prods. Group, Inc.,* 900 F.2d at 1557, we held that mathematical imbalance is insufficient to disqualify a bid; the bid must be materially imbalanced to be rejected. "It is not every bid deviation or error which automatically compels a bid rejection." *Excavation Constr., Inc. v. United States,* 494 F.2d 1289, 1293 (Ct.Cl.1974). In the related matter of the recovery of bid proposal costs, admittedly reviewed under the more lenient arbitrary and capricious standard, "if one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding process." *Keco Indus., Inc. v. United States,* 492 F.2d 1200, 1203 (Ct.Cl.1974); *see also Bur-*

*roughs Corp. v. United States,* 617 F.2d 590, 600 (Ct.Cl.1980).

II.

A.

Andersen contends that FMS engaged CSC in improper discussions after the contractors submitted their BAFOs. Pursuant to the RFP, the offeror selected to perform the government-witnessed benchmark, the apparent awardee, had to certify that the software to be used in the benchmark was the same as that proposed in their BAFO. At CSC's government-witnessed benchmark, FMS discovered discrepancies between CSC's benchmark software certification (the software actually to be run in the government-witnessed benchmark) and the software inventory list submitted with its BAFO. The lists contained different versions or releases of software products and also conflicted on whether Ideal/Escort (benchmark certification) or Ideal/PC (BAFO inventory) was actually proposed. When FMS asked about the discrepancies, CSC explained that the errors were clerical and that the benchmark certification was correct.

■ The board agreed that CSC's errors in preparing the BAFO list were clerical. This determination is critical, for under FAR § 15.607(c), clerical mistakes in a BAFO may be corrected without reopening negotiations. FAR § 15.607(c)(3) states:

If an offeror requests permission to correct a mistake in its proposal, the agency head (or a designee not below the level of chief of the contracting office) may make a written determination permitting the correction; *provided,* that (i) both the existence of the mistake and the proposal actually intended are established by clear and convincing evidence from the solicitation and the proposal and (ii) legal review is obtained before making the determination.

Further, FAR § 15.607(c)(5) clarifies that if "correction of a mistake requires reference to documents, worksheets, or other data outside the solicitation and proposal in order to establish the existence of the mis-

take, the proposal intended, or both, the mistake may be corrected only through discussions under 15.610."

The board's finding on the nature of CSC's errors is supported by substantial evidence. FMS was able to recognize the errors because of the personal knowledge of their evaluators,[1] by reference to the benchmark certification (part of the proposal), or by the solicitation requirement that the most current software releases be provided. Further, the entire FMS team present at the benchmark, the contracting officer, the FMS technical team, the Director of FMS' procurement division and an attorney from FMS' Office of Chief Counsel, was confident that the software being run on the witnessed benchmark was the software actually being proposed. It was not in the government's best interest to reopen discussions under 48 C.F.R. § 15.611(c). *See SMS Data Prods. Group, Inc. v. Austin*, 940 F.2d 1514, 1518 (Fed.Cir. 1991).

### B.

CSC's initial proposal offered Ideal/Escort, a software product designed to meet the solicitation's fourth generation language facilities. Ideal/PC is a software program, similar to, but more advanced than, Ideal/Escort. At the time CSC submitted its BAFO, Ideal/Escort was commercially available but Ideal/PC was not; therefore, if CSC had proposed Ideal/PC, it would have violated the commercial availability requirement. In its BAFO, CSC intended to propose Ideal/PC instead of Ideal/Escort, and to this end it meant to delete all references to Ideal/Escort from its BAFO. But many of the references to Ideal/Escort did not get changed. CSC also did not remove the Ideal/Escort technical literature from the BAFO. From the mix of references, the FMS evaluator determined that Ideal/Escort was being offered instead of Ideal/PC. At the benchmark, FMS asked why Ideal/PC was listed in the BAFO software list, while Ideal/Es-

cort was listed in the benchmark certification. CSC responded that the benchmark would be run with Ideal/Escort and that Ideal/PC would later be provided free of charge.

■ The board found that CSC offered Ideal/Escort as well as Ideal/PC in its BAFO, even though it intended to offer only Ideal/PC. The board reasoned that "proposals must be evaluated on the basis of what they contain, not what their authors intended that they contain." 91–1 B.C.A. (CCH) at 117,757. We agree; the "subjective unexpressed intent of one of the parties" to a contract is irrelevant. *ITT Arctic Servs., Inc. v. United States*, 524 F.2d 680, 684, 207 Ct.Cl. 743 (1975) (citing *Dana Corp. v. United States*, 470 F.2d 1032, 1041, 200 Ct.Cl. 200 (1972)). It is ironic that CSC's errors in preparation have favorable consequences, but we affirm the board's finding that Ideal/Escort was proposed because it is supported by substantial evidence.

### C.

■ While CSC did not offer FTAM, X.400 or VTP in its BAFO, it did offer a platform that would interact with any of these protocols. Andersen argues this was insufficient to meet the GOSIP compliant requirement that FTAM, X.400 and VTP must be "supported." According to Andersen, "support" means "provide" so CSC had to offer these protocols in its BAFO. The board said that the plain meaning of "support" is not that CSC had to provide the functions, only that the proposed software had to "work with" the functions. Both CSC and Andersen provided expert testimony on their respective interpretations of "support." A FMS systems integrator also testified in support of CSC's interpretation. The board's interpretation is also supported by general contract law requiring terms in a contract to be given their "ordinary and commonly accepted

---

**1.** Andersen urges that under FAR § 15.607(c)(5) the Treasury officials should not be allowed to use their personal knowledge in determining whether there are clerical errors in a BAFO.

We agree with CSC that this is nonsensical because it would, for example, require computer experts to forget their expertise when evaluating a proposal.

meaning," without a "twisted or strained out of context analysis." *ITT Arctic Servs.*, 524 F.2d at 684 (citing *Hol–Gar Manufacturing Corp. v. United States*, 351 F.2d 972, 976, 169 Ct.Cl. 384 (1965)). We have no reason to quarrel with the meaning of "support" imputed by the board.

### D.

■ The board found that a substantial amount of the price difference between CSC's and Andersen's BAFO's resulted from CSC's proposal of reconditioned equipment. It also found that even if Andersen was correct about every other one of its allegations of faulty price analysis,[2] CSC's price would still be lower than Andersen's. These findings are sufficient to support the price realism analysis performed by FMS. We reject the notion that the board had to conduct an independent analysis.

### III.

■ Finally, Andersen says this case is analogous to *Data General Corp. v. United States*, 915 F.2d 1544. There the government issued a solicitation for automated data processing equipment, the goal of which was to improve existing data processing systems located in more than 200 offices throughout the United States. Since the needs of the individual offices varied widely, the solicitation stressed that the proposals were required to leave enough flexibility to custom-configure each individual system. The contracting officer disqualified SMS Data Products Group, Inc. (SMS) because its proposal violated the solicitation requirements that all software be licensed for all processors and that the software be licensed by the number of processors (not users) per system. *Id.* at 1546. SMS protested its disqualification to the board.

Based on what it determined were the agency's "true needs," the board found SMS's proposal to be technically compliant and granted the protest. We reversed, holding that the board's independent analysis of needs is both irrelevant and illegal and that the board must give terms in a solicitation or proposal their "plain and unambiguous meaning." *Id.* at 1551. We said that "the board has no warrant to question the agency's judgment or to revise its delegation of procurement authority to ensure that the agency's assessment of its 'true' needs is in harmony with the board's. The board has neither the authority nor the expertise to second-guess the agency." *Id.* at 1552. In contrast, here the board deferred to FMS's analysis of its needs.

Andersen counters that the board must adhere to the agency's assessment of its needs not only when it awards the contract, but also when it issues the solicitation. By denying the protest over de minimis errors, the board has reinterpreted the solicitation. We do not think so. De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are. That is the case here.

### *Conclusion*

Accordingly, the decision of the board is affirmed.

AFFIRMED.

___

2. Andersen alleged that CSC discounted its software products in years 6–10 on the assumption that they would not be purchased; that CSC proposed that IBM would provide its catastrophic backup services while pricing the services at the cost of providing them in-house; that CSC offered equipment maintenance in the outyears at below cost; and that CSC did not include the cost of warranting the reconditioned equipment it proposed.