NAVARRO RESEARCH AND
ENGINEERING, INC.,
Plaintiff,

v.

The UNITED STATES, Defendant,

North Wind, Inc., Intervenor-defendant,

Earth Resources Technology, Inc.,
Intervenor-defendant.

No. 12–61 C.

United States Court of Federal Claims.

Aug. 17, 2012.[1]

1. This opinion was issued under seal on May 25, 2012. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary or otherwise confidential material subject to deletion on the basis that the material was protected/privileged. On June 15, 2012, the parties filed a proposed public version of the court's opinion in this case. Because the court determined that the redactions proposed by the parties were excessive, it directed them to limit their proposed redactions to information that was actually proprietary or otherwise confidential and that was not already available to the public. The parties filed a second redacted version of the opinion on August 10, 2012, and the court has adopted all of the redactions proposed therein. Brackets ( [ ] ) identify the redacted portions of this opinion.

Robert J. Symon, with whom were Daniel P. Golden and Aron C. Beezley, Washington, DC, for plaintiff.

Daniel B. Volk, United States Department of Justice, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Harold D. Lester, Jr., Assistant Director, Washington, DC, for defendant.

Kevin P. Mullen, with whom was Sarah A. Maguire, Washington, DC, for intervenor-defendant North Wind, Inc.

William T. Welch, with whom was J. Patrick McMahon, Reston, VA, for intervenor-defendant Earth Resources Technology, Inc.

## OPINION

BUSH, Judge.

Navarro Research and Engineering, Inc. (Navarro) filed its bid protest complaint in this court on January 30, 2012. In its complaint, Navarro challenges the decision of the National Aeronautics and Space Administration (NASA) to proceed with corrective action recommended by the United States Government Accountability Office (GAO) related to a contract previously awarded to Navarro under Request for Proposals No. NNJ10336475R (the RFP). NASA elected to adopt the challenged corrective action following a successful bid protest to GAO by

two disappointed bidders, North Wind, Inc. (North Wind) and Earth Resources Technology, Inc. (ERT).

In this case, the protestor asks that this court rule that GAO's decision was irrational. Navarro requests a declaration that the award of the contract to Navarro was proper and consistent with both the RFP and applicable procurement law. In addition, Navarro requests that the court enjoin NASA from proceeding with any action, including the proposed corrective action, that might result in an award of the contract to any company other than Navarro. The subject contract is for environmental compliance and restoration services at the White Sands Test Facility (WSTF) in New Mexico. North Wind and ERT have both intervened in this suit. Navarro's bid protest is now before the court on cross-motions for judgment on the administrative record brought pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).

Defendant has agreed to wait until the court resolves this protest on the merits before issuing an amended solicitation for the requirements of the contract. The court established a briefing schedule for the parties' dispositive motions, and oral argument was held on May 8, 2012. For the reasons discussed below, the court concludes that the GAO decision sustaining the protests of North Wind and ERT was not irrational. For that reason, NASA's decision to proceed with the corrective action recommended by GAO was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the court hereby denies Navarro's motion for judgment on the administrative record and grants defendant's and intervenors' cross-motions.

## BACKGROUND

### I. Factual Background

This case involves a procurement by NASA for environmental compliance and remediation support services at the WSTF

under a contract known as the Environmental Compliance and Operations (ECO) contract. The ECO contract was originally awarded to Navarro, and that initial award was protested to GAO. Prior to the issuance of any GAO decision on the merits, NASA elected to take corrective action, and the initial GAO protest was dismissed as academic. Following its re-evaluation of the Navarro proposal, NASA awarded the contract to Navarro once again, and that award was also protested to GAO. GAO ultimately sustained the protest of the award to Navarro, and NASA elected to take corrective action as recommended in the GAO decision. This suit challenges NASA's decision to move forward with that corrective action.

### A. The Environmental Compliance and Operations Contract

On July 27, 2010, NASA issued the RFP, in which it requested proposals for the ECO contract. See Administrative Record (AR) Tab 13. The ECO contract is an indefinite-delivery, indefinite-quantity (IDIQ) contract that entails both cost-plus-fixed-fee (CPFF) and firm-fixed-price (FFP) requirements to be issued as task orders. AR 927. Under the RFP, competition for the contract was to be limited to small businesses. AR 913. The contract was to be for an initial base term of two years, plus four one-year options. AR 913. The contract had a not-to-exceed value of $80 million, and a guaranteed minimum value of $100,000. AR 932.

The requirements of the contract were described in Section C of the RFP, the Performance Work Statement (PWS). See AR 933–66. The requirements described in section 1.0 of the PWS were to be performed pursuant to FFP task orders, while the contract requirements described in section 2.0 and section 3.0 were to be performed pursuant to CPFF task orders.[2] AR 927. Section 1.0 of the PWS covered the program management, planning, and reporting requirements of the ECO contract, AR 938–42,

---

**2.** The government reserved the right to issue FFP task orders under sections 2.0 and 3.0 of the PWS as well. AR 942, 947. The RFP also contemplated a sixty-one-day phase-in period, which was to be performed on a fixed-price

basis. AR 927. The RFP explained that the price proposed by each offeror for its phase-in period would not be used as a discriminator in the evaluation process and would be reviewed only for its reasonableness. AR 1243.

section 2.0 of the PWS contained the environmental restoration requirements of the contract, AR 942–47, and section 3.0 covered the environmental compliance requirements of the contract, AR 947–60.

Section M of the RFP informed potential offerors that their proposals would be evaluated, and that the ECO contract would be awarded, on a best-value basis:

> The contract will be awarded on the basis of the evaluation factors for mission suitability, past performance, and price to those responsible offerors submitting offers considered most advantageous to the Government. The lowest price proposals may not necessarily receive an award; likewise, the highest technically rated proposals may not necessarily receive an award. Rather, the Government will award to those offerors whose proposals offer the best overall value to the Government.

AR 1238.

With respect to the three evaluation factors set forth in Section M—mission suitability, past performance, and price—the RFP explained that

> mission suitability is more important than past performance and price when combined. Past performance is more important than price. And mission suitability and past performance, when combined, are significantly more important than price.

AR 1244. The mission suitability factor included three subfactors: technical approach; management; and safety and health. AR 1239. The technical approach subfactor, moreover, contained two parts: overall technical approach; and specific technical understanding and resources. AR 1240; *see also* AR 1148–49.

The RFP explained that mission suitability would be the only factor for which proposals would be assigned a numeric score, and that the 1000 points available for that factor would be allocated as follows:

| | | |
|---|---|---|
| Sub-factor 1 | Technical Approach (TA) | 450 |
| Sub-factor 2 | Management (MA) | 400 |
| Sub-factor 3 | Safety and Health (SH) | 150 |
| | TOTAL | 1000 |

AR 1239. The RFP did not discuss how the 450 points for the technical approach subfactor would be divided between its two parts,

but it provided that both would be evaluated in accordance with the same criteria:

> The Government will evaluate the offeror's Technical Approach for overall demonstrated comprehensive understanding, effectiveness, soundness, feasibility, efficiency, and innovation. For any proposed improvements, innovations, and efficiencies, the Government will evaluate the appropriateness and its potential for effective and efficient implementation in the contract. Failure to capture proposed efficiencies and innovations in the model contract may result in loss of mission suitability points. These evaluation criteria will be used for both TA1 Part 1 and TA1 Part 2.

AR 1240.

The RFP noted that "[a]lthough proposals are organized by factors and sub-factors, the Government will conduct an integrated evaluation, considering any proposal data in its evaluation of each factor and sub-factor." AR 1239. For that reason, "all aspects of the offeror's proposal will be considered during the evaluation process, including the offeror's proposed Model Contract." AR 1239.

The RFP informed offerors that proposals would be reviewed and evaluated by a Source Evaluation Board (SEB), but that the ultimate selection of a proposal for contract award would be rendered by a Source Selection Authority (SSA):

> The offeror's proposal will be evaluated by [the SEB] in accordance with applicable regulations which include the [Federal Acquisition Regulation (FAR)] and the NASA FAR Supplement. The SEB will carry out the evaluation activities and report its findings to the [SSA], who is responsible for making the source selection decision. Acceptable offers will be evaluated to identify deficiencies, strengths, and weaknesses utilizing the evaluation factors and sub-factors set forth in Provision M.5 below.

AR 1238.

The requirements for proposals were described in Section L of the RFP, which stated that the information required under that section "is considered essential for the Gov-

ernment to conduct a fair and uniform evaluation of proposals in accordance with the evaluation factors and sub-factors provided in Section M." AR 1143. In that regard, the RFP cautioned offerors that they were "required to meet all solicitation requirements, such as terms and conditions, representations and certifications, and technical requirements, in addition to those identified as areas, factors, and sub-factors to be eligible for award." AR 1244. Accordingly, offerors were warned that any "[f]ailure to comply with solicitation requirements may result in a weakness, deficiency, or in an offeror being removed from consideration for award." AR 1244.

The RFP required each offeror to organize its proposal into five separate volumes, some of which were limited to a specific number of pages:

| Volume | Contents | Page Limitation |
|--------|----------|-----------------|
| I | Mission Suitability | 50 |
| II | Past Performance | 15 |
| III | Cost and Price | not limited |
| IV | Plans and Other Data | 100 |
| V | Model Contract | not limited |

AR 1145–46. NASA sought to enforce the page limits through other requirements in the RFP, such as restrictions on paper size, font size, and margin width, as well as the manner in which fold-out pages were to be counted toward the page limits. *See* AR 1134.

Importantly, the RFP stated in Section L and in Section M that "[p]ages submitted in excess of the limitations specified in this provision will not be evaluated by the Government and will be returned to the offeror." AR 1135, 1239. In addition, the requirements for the cost volume state that "[i]nformation that can be construed as belonging in one of the other sections of the proposal will be so construed and counted against that section's page limitation." AR 1134.

The RFP noted that information contained in each volume of the proposal "should not be incorporated by reference." AR 1146. Nonetheless, the RFP also stated that "[m]aterial that is submitted in other volumes of the proposal may be referenced in Mission Suitability, Volume I, Sub-factor 1." AR 1148. But when "material is referenced from other volumes, the location of the information in the other volumes must be specifically identified in the Mission Suitability, Volume I, Sub-factor 1." AR 1148.

The RFP presented three task orders for the purpose of evaluating the technical approach subfactor. *See* AR 1149, 1195–1215. NASA intended to award the first task order (under section 1.0 of the PWS) to the successful offeror, but provided the other two task orders (under sections 2.0 and 3.0 of the PWS) as samples for the sole purpose of evaluating the offerors' proposals. AR 1149. In accordance with the RFP, the first of the three task orders was to be treated as an FFP task order, while the other two task orders were to be treated as CPFF task orders. AR 1149.

For each of the three task orders, offerors were required to provide three levels of detail. First, offerors were instructed to discuss their specific technical understanding of the task order requirements. Next, offerors were required to provide their basis of estimate (BOE), including any efficiencies or cost savings.[3] Finally, offerors were told to include cost estimates in the form of resource tables. AR 1149–50. The RFP included a blank template to be used for the required resource tables, and noted that those tables must be consistent with the narrative discussion contained in the mission suitability volume and with the figures presented in the separate cost volume. AR 1151; *see also* AR 1149 ("[T]he [full-time equivalents (FTEs) ] listed on the resources tables must agree

---

3. The RFP did not set forth a concise definition of a BOE. During the hearing before GAO, the contracting officer testified that a BOE is "an adequate explanation to convince the Government that the resources proposed are realistic for the management and Technical Approach proposed by any one Offeror." AR 11383. But that is just one of several elements that offerors must provide in setting forth the BOE in their proposals. The contracting officer stated, for example, that the BOE must also include "an explanation of what we call FTEs or full-time equivalents, and it also includes rationale for skill mix proposed." AR 11384. The RFP's specific requirements for the BOE are set forth in their entirety in this opinion, *infra*.

with the resources in the Cost Volume III. Inconsistency between these two areas may result in negative mission suitability findings and cost realism adjustments (probable cost).").

Because the BOE requirements set forth in the RFP are central to the arguments advanced by the parties in this case, those requirements will be reproduced here in their entirety:

> Explain the BOE by providing supporting rationale for all labor resources (FTEs and skill mix) proposed. Include a discussion regarding how the proposed FTEs were estimated. Also, include a discussion associated with any assumptions made regarding the requirements that led to the proposed resources such as: "we assume that a verification plan for the XYZ deliverables already exists and all we are responsible for is the maintenance of the plan." Include sufficient narrative discussion to convince the Government that the proposed resources are realistic for the proposed technical and management approach. Include with your narrative discussion a schedule and critical path for the proposed effort.
>
> Offerors are required to estimate any non-labor resource dollars for the fixed-price and cost reimbursable IDIQ portion of this contract. A narrative BOE shall be provided that depicts the offeror's understanding of the required non-labor resources.
>
> Explain any applicable efficiencies or cost savings, in sufficient detail to allow for a comprehensive analysis. If efficiencies, or cost savings, are being proposed, ensure sufficient supporting information to perform a technical analysis is provided. Also, describe how any proposed methodologies, processes, and techniques used to gain efficiencies would be implemented. Address risks and risk mitigation plans associated with savings or improvements. Make sure historical references to other contracts are relevant in size and complexity. Also explain in detail how the proposed percentage savings can actually be achieved. Efficiencies or cost savings that affect multiple areas or go across an entire

PWS will be addressed in detail in the offeror's response to TA1, Part 1 (Overall Technical Approach).

AR 1150. The RFP stated that the BOE narrative "shall be provided in accordance with" the requirements described above. AR 1150; *see also* AR 1149 (describing the levels of detail set forth in Table L–4, which included the BOE narrative, as "information offerors are required to provide").

The RFP included an independent government estimate (IGE), which was set forth in three separate tables. The first table (Table L–7) represented the government's estimate of direct labor staffing for the first year of each of the three task orders. *See* AR 1157. The second table (Table L–8) set forth the government's estimate of non-labor resource costs for each of the three task orders in the first year of contract performance. *See* AR 1158. Finally, the third table (Table L–9) presented the government's estimate of cumulative labor staffing by skill mix for all IDIQ work anticipated during the first year of contract performance. *See* AR 1159.

The RFP informed offerors that they should not simply plug the numbers from the IGE into their own proposals and explained that

> [t]his IGE represents the Government's estimate for accomplishing the IDIQ fixed-price Task Order 1 and Sample Cost Reimbursable Task Orders 2 and 3 without the incorporation of any one offeror's specific management and technical approach. It is intended to assist you in determining the magnitude of the labor FTE and non-labor resources (NLR) requirements. This is not to be considered a Government "plug number."

AR 1160.

In fact, the RFP emphasized that the IGE should not influence the offerors' proposals and should be used only to assist the offerors in developing their own unique technical and management approaches:

> The IGE is based on historical usage factors which may not be representative of 100% of usage for future work. The IDIQ IGE provided above is not intended to influence the offeror's proposal estimates;

however, it is provided to assist offerors in determining the general overall scope to support development of indirect rates and for development of their management and technical approaches. Offerors shall develop their own estimates that support their unique proposal management and technical approaches and shall provide supporting rationale in narrative form.

AR 1159.

The RFP noted that use of the IGE for non-labor resources was elective, and that "[o]fferors are free to incorporate the IGE into their Cost/Price Volume or to propose non-labor resource costs as deemed appropriate to accomplish the Task Orders." AR 1160. But if an offeror elected to deviate from the IGE for non-labor resources, that offeror was required to supply the following information as well:

Offerors shall provide adequate supporting rationale for the quantity of non-labor resources proposed (e.g., square foot requirements for facilities). Explain all the non-labor resources identified that will be indirectly charged to the contract through an indirect rate based on your disclosed accounting practices and contract requirements.

The offeror shall propose cost elements in a manner that is consistent with its disclosed and approved estimating and accounting practices. For example, certain non-labor resources (for example, facilities) are frequently treated as an indirect expense and included in overhead or G & A. In situations like this, offerors shall provide a complete description and rationale for all non-labor resources along with a statement communicating how these costs are to be charged in accordance with the offerors['] approved estimating and accounting practices.

AR 1160.

**B. Initial Award of the ECO Contract to Navarro**

In September 2010, NASA received proposals from six offerors, including Navarro and both intervenors. AR 1916–17. The offerors' proposals were evaluated by the SEB as follows:

| Offeror | Mission Suitability Score | Past Performance Confidence | Total Proposed / Probable Cost (millions) |
| --- | --- | --- | --- |
| ECGS | [ ] | Moderate | $ [ ] |
| Navarro | 950 | Very High | $33.4 / $36.2 |
| ERT | [ ] | High | $ [ ] |
| SpecPro | [ ] | Low | $ [ ] |
| North Wind | [ ] | Very High | $ [ ] |
| Zia | [ ] | Moderate | $ [ ] |

AR 1928. Navarro received the highest score on the mission suitability factor, while the scores of ERT and North Wind on that factor ranked second and fourth, respectively.

For the mission suitability subfactor most relevant to Navarro's protest—technical approach—the offerors' proposals were assigned the following strengths, weaknesses, and adjectival ratings:

| Offeror | Significant Strength | Strength | Weakness | Significant Weakness | Adjectival Rating |
|---------|---------------------|----------|----------|---------------------|-------------------|
| ECGS | 0 | 0 | 0 | 2 | Poor |
| Navarro | 2 | 0 | 0 | 0 | Excellent |
| ERT | 0 | 1 | 2 | 0 | Good |
| SpecPro | 0 | 1 | 1 | 0 | Good |
| North Wind | 0 | 1 | 0 | 3 | Poor |
| Zia | 0 | 1 | 1 | 0 | Good |

AR 1773–75.

One of the significant strengths assigned to the Navarro proposal was based upon its detailed BOE. The SEB explained that "[t]he offeror's clear and concise basis of estimate and associated resource evaluations demonstrates a comprehensive understanding of the complexity and scope of the work which will ensure the highly effective and efficient implementation of the technical program requirements." AR 1487. The other significant strength assigned to the Navarro proposal for the technical approach subfactor, while not specifically attributed to the merits of its BOE, was based, in part, on an attachment to the proposal that contained the BOE and resource tables for the three sample task orders. AR 1486 (stating that the significant strength was based on "Volume I, Sections TA1, TA1–1 through TA1–2, and Task Order Resource Sheet addendum").

In contrast, the SEB assigned the North Wind proposal three significant weaknesses on the technical approach subfactor—one for each sample task order—for what it determined to be an insufficient BOE. *See* AR 1437–42. In each case, the SEB concluded that the North Wind proposal failed to demonstrate a sufficient understanding of the resources necessary for each of the three sample task orders due to its "unsubstantiated and infeasible basis of estimate, ineffective rationale for proposed efficiencies, and insufficient justification for the proposed changes." AR 1437, 1439, 1441.

The SEB assigned the ERT proposal one strength and two weaknesses on the technical approach subfactor. AR 1474–76. The technical approach scores assigned to the proposals submitted by Navarro, North Wind, and ERT were 445, 135, and 300, respectively, out of a total possible score of 450 points. AR 1540.

With respect to past performance, Navarro and North Wind were both assigned a rating of Very High Level of Confidence, while ERT received a rating of High Level of Confidence.[4] AR 1613. Navarro and North Wind received the same rating for past performance, but Navarro was assigned two significant strengths, AR 1621, while North Wind was assigned only one significant strength and one strength, AR 1635.

The North Wind proposal had the lowest evaluated price by a significant margin, AR 1656, but the SEB expressed a low level of confidence in the probable cost of the proposal, AR 1645, and concluded that there was a high degree of risk for the fixed-price component of the contract, AR 1647. The price and cost of Navarro's proposal was slightly below the average price and cost of all proposals submitted by the offerors, while the price and cost of the ERT proposal was somewhat above that average.[5] AR 1777.

Based on its evaluation of the proposals, the SEB briefed the SSA on its findings and

---

4. For past performance, the possible ratings were: (1) Very High Level of Confidence; (2) High Level of Confidence; (3) Moderate Level of Confidence; (4) Low Level of Confidence; (5) Very Low Level of Confidence; and (6) Neutral. AR 1242.

5. The SEB expressed a high level of confidence in the probable cost of the proposals submitted by Navarro and ERT, AR 1645, and stated that the fixed-price component of those proposals presented a low risk to the government, AR 1647.

recommended that the ECO contract be awarded to Navarro without discussions. AR 1661–63. In her source selection statement, the SSA noted that one of Navarro's significant strengths under the technical approach subfactor was its "sound and effective Task Order approach concerning associated resource sheets, basis of estimate, and supporting rationale." AR 1773 (footnote omitted). In that regard, the SSA explained that "[t]he highly refined Navarro resource sheets and basis of estimate clearly described the total available Full Time Equivalent (FTE) resources per Task Order, and then apportioned those resources to the third level of a Work Breakdown Structure (WBS) designed for each Task Order." AR 1773 n. 4.

In contrast, the SSA noted that the North Wind proposal was assigned a significant weakness for one of the task orders because "[t]he proposed resources were based on an unsubstantiated and infeasible basis of estimate, ineffective rationale for proposed efficiencies, and insufficient justification for the proposed changes." AR 1774. One of the other significant weaknesses assigned to the North Wind proposal, related to a different task order, was due to the fact that "the proposed [ ], without providing an adequate justification or rationale." AR 1774.

Following her discussion of the strengths and weaknesses of the individual proposals, the SSA accepted the findings of the SEB and then engaged in a tradeoff analysis to determine which of the proposals represented the best value to the government. With respect to the mission suitability factor, the SSA found that the Navarro proposal was superior to those submitted by the other offerors:

> Of particular note, Navarro's technical proposal was clearly distinguished as exemplified by its two Significant Strengths and more specifically, by its demonstrated comprehensive understanding of the ECO requirements for each task order and by its clear, concise, and very detailed proposal for each task order. I personally recognize the importance of a very detailed proposal for a task order and how such detail can substantially increase the probability of a task's success in terms of meeting

technical requirements, schedule, and budget. Considering that the ECO contract is a 100% IDIQ Task Order contract, I agreed with the SEB that this comprehensive demonstrated understanding, reflected in the detail of Navarro's proposal for each task order, will provide significant benefit to the Government during the contract term. Hence, Navarro's proposal for the Technical Approach sub-factor was superior and distinguished as reflected in its clear, concise, and very detailed proposal for each task order.

AR 1778–79. In contrast, the SSA noted that North Wind had received a rating of Poor for mission suitability, and stated that its "three Significant Weaknesses in this subfactor all relate to a failure to demonstrate a comprehensive understanding of technical requirements associated with the subject contract." AR 1779.

The SSA noted that North Wind had received a rating of Excellent on the management subfactor, while Navarro was assigned a rating of Very Good, but nonetheless concluded that the two proposals were "qualitatively equal to each other and . . . moderately distinguished themselves from ERT's proposal in regard to the [ ] sub-factor." AR 1779. The SSA also acknowledged that the Navarro and North Wind proposals each received a rating of Excellent for the Safety and Health subfactor, and concluded that the two proposals were qualitatively equal with respect to that subfactor as well. AR 1779– 80.

Due to the relative importance of the technical approach subfactor in the evaluation scheme set forth in the RFP, the SSA concluded that the Navarro proposal represented the highest relative value to the government with respect to the mission suitability factor. AR 1780. The SSA based her decision on the superior rating and significant strengths assigned to the Navarro proposal, the poor rating and significant weaknesses assigned to the North Wind proposal, and the relative equality of those proposals on the other evaluation subfactors.

As noted above, the proposals submitted by Navarro and North Wind were assigned the same rating for past performance. But

the SSA concluded that the Navarro proposal represented the highest relative value to the government on that factor because it received a significant strength for its prevention of injuries and illnesses, while North Wind received only a strength in that substantive area. AR 1780–81.

Finally, the SSA noted that the North Wind proposal had the lowest combined price and proposed cost, and the lowest combined price and probable cost, but further observed that the proposal was assigned a low level of confidence for its probable cost and was deemed to be high-risk in terms of its combined price. AR 1781. The SSA pointed out that the Navarro proposal also had a lower probable cost and combined price than the technically inferior proposal submitted by ERT. Based on her tradeoff analysis and the recommendation of the SEB, the SSA elected to award the ECO contract to Navarro without discussions. AR 1781–82. NASA notified the offerors of that decision on February 11, 2011, and awarded the ECO contract to Navarro on February 28, 2011. NASA debriefed each of the six offerors in March 2011. *See* AR Tab 27.

### C. First GAO Bid Protest

North Wind filed a protest of the initial award to Navarro with GAO on March 14, 2011. *See* AR Tab 29. In that protest, North Wind argued that NASA's evaluation of its proposal was flawed in a number of important respects. ERT did not protest the award to Navarro, nor did it participate in the North Wind protest.

When it filed the contracting officer's report and memorandum of law with GAO, NASA also produced copies of the Navarro proposal. *See* AR Tab 30. In reviewing that proposal, North Wind discovered that the mission suitability volume contained a total of 109 pages, including fifty pages within the main body of the volume, plus fifty-six pages of BOE narrative and three pages of resource tables.[6] *See* AR 2667–2779. Based on that discovery, North Wind filed a supplemental protest with GAO on April 22, 2011, arguing that Navarro had violated the page limits set forth in the RFP, and that NASA had conferred an unfair competitive advantage upon Navarro by ignoring that violation. *See* AR Tab 42.

Following the submission of North Wind's supplemental comments, NASA informed GAO that it would re-evaluate the Navarro proposal without the fifty-six additional pages of BOE narrative contained in the attachment. In its letter to GAO, NASA stated that "[t]he Agency believes the [SEB's] consideration of [the BOE attachment] may have been inconsistent with the terms of the RFP."[7] AR 8511. In the corrective action plan attached to that letter, NASA stated that its re-evaluation would be limited to the technical approach subfactor. AR 8513–15. NASA also stated that in addition to the re-evaluation of Navarro's technical approach, "the North Wind technical approach and associated strengths and weaknesses will be re-validated by the [SEB]." AR 8513.

In a letter to GAO, *see* AR 8516–18, North Wind objected to the corrective action proposed by NASA. North Wind argued that NASA should amend the RFP to allow offerors to submit revised proposals with a common page limit. AR 8517. In the alterna-

---

6. The RFP stated that "[a]n initial review will be conducted to determine acceptability of proposals[,]" and that "[a]ll unacceptable proposals will be eliminated from further evaluation." AR 1144. Similarly, the evaluation plan for the procurement stated that "[a]ny proposal that is received late, has an excess page count, is incomplete, or is found to be unacceptable in any way shall be dispositioned with the SEB legal advisor prior to taking action." AR 841. The Navarro proposal was reviewed by NASA for acceptability upon its submission, but the reviewer apparently failed to notice that the mission suitability volume exceeded the page limitations set forth in the RFP. *See* AR 1979.

7. In its initial response to the supplemental protest, NASA did not deny that it considered the information contained in the BOE attachment when it reviewed the Navarro proposal; instead, it argued that the fifty-six pages of additional BOE narrative were resource sheets that were not required to be counted against the page limits set forth in the RFP. *See* AR 8498–8500. In addition, NASA further asserted that any challenge to its consideration of the BOE attachment was untimely. AR 8497–98.

tive, North Wind argued that any proper re-evaluation of the same proposals must entail the appointment of new evaluators, a new SEB, and a new SSA because it would be "unreasonable to expect that NASA's evaluators, SEB, and SSA would be capable of objectively re-evaluating and rescoring Navarro's proposal, after the removal of the extra pages, without being influenced by the additional information on those extra pages that compromised the original evaluation and source selection decision." AR 8517.

GAO rejected North Wind's objection to the proposed corrective action, noting that agencies are afforded significant discretion in the development of corrective action plans to ensure fair and impartial competition. AR 8521–22. But GAO further noted that "[i]f after the agency completes its re-evaluation of Navarro's proposal, and makes a new source selection, North Wind believes that the award was improper, it may protest the award and re-raise this objection of the re-evaluation." AR 8522 n. 1. In accordance with its corrective action plan, NASA terminated the ECO contract for convenience on June 23, 2011. AR 8524.

### D. Re-award of the ECO Contract to Navarro

Following the dismissal of North Wind's initial GAO protest, the SEB re-evaluated the Navarro proposal without the additional fifty-six pages of BOE narrative attached to its mission suitability volume. The SEB confined its re-evaluation to the mission suitability volume of the Navarro and North Wind proposals, as contemplated under the corrective action plan, and its briefing to the SSA focused on the four top-rated proposals: Navarro, North Wind, ERT, and Zia. See generally AR Tab 59.

It is apparent from the record that the SEB did not perform a wholesale re-evaluation of Navarro's mission suitability volume. The new evaluation sheets for the management subfactor and the safety and health subfactor appear to be identical to those prepared by the SEB during its initial evaluation. Compare AR 1683–94 with AR 9653–64. On the technical approach subfactor, Navarro lost one of its significant strengths and gained one strength and one weakness during the re-evaluation, resulting in a one-step reduction of its adjectival rating on that subfactor. Compare AR 1485–87 with AR 9647–52.

The evaluation sheet for the only remaining significant strength is nearly identical to the evaluation sheet for one of the significant strengths assigned to Navarro by the SEB in its initial evaluation, with a few revisions to account for the absence of the BOE narrative attached to the original proposal submitted by Navarro. Compare AR 1485–86 with AR 9647–48. The only substantial changes in the SEB's evaluation of the Navarro proposal are an evaluation sheet for a new strength discovered by the SEB during its re-evaluation, see AR 9649–50, and an evaluation sheet for a new weakness, attributed to Navarro's failure to expressly announce its adoption of the IGE in the body of its mission suitability volume, see AR 9651–52.

The new strength assigned to Navarro's proposal stated that "[t]he offeror's technical approach for the fixed-price and cost-reimbursable task order requirements demonstrates a strong technical understanding of the task order level activities including methodologies, task order interdependencies, contractor interfaces, and project-level risks which will contribute to the successful performance of the [ECO] contract." AR 9649. The supporting narrative for the new strength further noted that "Navarro accepts the [IGE] for all task order resource decisions including [FTEs] and associated non-labor resources, then clearly explains their understanding of the technical program requirements relating to those resources." AR 9649. In the hearing before GAO, the contracting officer testified that the new strength was not apparent during the initial evaluation because the SEB had been focused on the information contained in the BOE attachment, and that the removal of that attachment forced the SEB to take a closer look at the main body of the mission suitability volume. See AR 11434–37.

The new weakness assigned to the Navarro proposal was based on its failure to expressly state its adoption of the IGE in the mission suitability volume:

The offeror's resource allocations were based solely on the [IGE]; however, the offeror did not specifically state that intent in the [BOE] narrative discussion included within their Technical Approach section. Therefore, the Government's integrated proposal evaluation of the offeror's resource sheets, management approach, and corresponding cost volume information was necessary in order to conclude that the offeror fully understood the task order requirements and that their approach was effective and feasible.

AR 9651 (citation to RFP omitted). In the supporting narrative for the weakness, the SEB further stated that Navarro's resource sheets indicated its intent to adopt the IGE for both FTEs and non-labor resources, but noted that those resource tables "included an apparent typographical error that carried over from Task Order 1.0 to Task Order 2.0 and resulted in a minor inconsistency with the associated cost volume." AR 9651.

The SEB stated that the RFP required offerors to adopt the IGE in the technical volume of their proposals, and acknowledged that Navarro had failed to do that. But the SEB further stated that its integrated evaluation of the other parts of the Navarro proposal—including the cost volume and staffing plan—revealed that Navarro did in fact intend to adopt the IGE. Because Navarro had adopted the IGE, moreover, the SEB concluded that Navarro was not required to provide a detailed narrative rationale for the FTEs and non-labor resources proposed:

> The RFP requires that supporting rationale be provided to explain the BOE as well as any applicable efficiencies or cost savings[;] however[,] due to the fact that no specific efficiencies or cost savings were proposed at the task order level, and the fact that Navarro elected to utilize the

IGE for all labor resources and skill mix[,] detailed supporting rationale or narrative discussion associated with any assumptions would not be necessary. The only issue is that a statement that the IGE was the sole basis of estimate was required by the RFP but omitted in the technical approach narrative; therefore, the Government's integrated evaluation of the overall proposal including their resource sheets, management approach (Staffing Plan), numerous statements about incumbent employee retention, and the associated cost volume information was necessary to convince the Government that Navarro fully understood the task order resource requirements and that their approach was both effective and feasible.

AR 9651–52.

Due to the changes in the evaluation described above, Navarro's overall score on the mission suitability factor was reduced from 950 points to 895 points, *compare* AR 1563 *with* AR 9566, with the entire fifty-five-point deduction drawn from the technical approach subfactor, *compare* AR 1553 *with* AR 9554. The SEB stated that its review of the North Wind proposal did not result in any changes to its findings or scoring for that proposal, *see* AR 9672, and the briefing slides presented to the SSA by the SEB appear to support that statement, *compare* AR 1588–99 *with* 9578–89.[8]

On July 9, 2011, the SSA once again selected Navarro for award of the ECO contract. AR Tab 48. In keeping with the limited scope of the SEB's re-evaluation of the Navarro and North Wind proposals, the new source selection statement issued by the SSA was just a revised version of the source selection statement issued before the first GAO protest.[9] In the revised document, the

---

8. Notwithstanding the apparent consistency in the SEB evaluations for North Wind, the SSA's source selection decision was revised to state that North Wind had received a rating of Very Good for the safety and health subfactor, in contrast to the original source selection statement, which stated that North Wind had been assigned an Excellent rating for that subfactor. *Compare* AR 1774 *with* AR 8738. But another section of the source selection statement states that both Navarro and North Wind were assigned ratings of Excellent for the safety and health subfactor,

AR 8742, and that statement of equality is supported by the briefing slides presented to the SSA by the SEB, AR 9563, 9586.

9. In addition to the major changes discussed above, there are also a number of less significant differences between the original source selection statement and the revised version. *Compare, e.g.,* AR 1780 ("In summary, due to the reasons discussed above and with particular emphasis on Navarro's superior technical proposal, I determined that Navarro offers the proposal with the

SSA noted that the SEB had assigned Navarro one significant strength, one strength, and one weakness for the technical approach subfactor (as compared with the original evaluation, which assigned Navarro two significant strengths for that subfactor), and that the SEB had assigned the North Wind proposal three significant weaknesses on the same subfactor.[10]

The SSA described the new weakness assigned to the Navarro proposal for the technical approach subfactor as follows:

> For this specific sub-factor, I noted that Navarro had one minor Weakness with respect to the BOE narrative. However, in accordance with the provisions of the [corrective action plan] and the RFP, the SEB's integrated proposal evaluation of the offeror's resource sheets, management approach and cost volume concluded that the offeror fully understood the task order requirements and that their approach was effective and feasible. Therefore, I determined that this Weakness represented little, if any, risk to the Government.

AR 8741. The SSA later testified that her understanding of the weakness assigned to the Navarro proposal, as explained to her by the SEB, was that Navarro had failed to include a single sentence in the mission suitability volume indicating that it adopted the IGE as its sole BOE. See AR 11329, 11347–49, 11374.

Based on the findings of the SEB and her tradeoff analysis, the SSA found that the Navarro proposal represented the best value

highest relative value for the Government with respect to the Mission Suitability factor."), *with* AR 8742 ("In summary, due to the reasons discussed above and with particular emphasis on Navarro's superior *technical proposal, I* determined that Navarro offers, *by a substantial margin,* the proposal with the highest relative value for the Government with respect to the Mission Suitability factor.") (emphasis added). Another revision to the document appears to be an attempt by NASA to preemptively challenge the standing of any unsuccessful offeror to file a subsequent bid protest with GAO or this court. *See* AR 8744 ("I further concluded that, even if there were discussions of the offerors' weaknesses and proposal revisions based on those discussions, it is unlikely that any of the offerors could close the substantial point difference enough to displace Navarro.").

to the government and thus selected it for award of the ECO contract. AR 8744. The unsuccessful offerors were notified of the new award to Navarro and were provided with a copy of the new source selection statement in support of that award on July 19, 2011. *See* AR 8761, 8763–64.

## E. Second GAO Bid Protest

North Wind and ERT filed separate bid protests at GAO on July 29, 2011, *see* AR Tabs 83, 93, and Navarro intervened in both, *see* AR Tabs 84, 94. In its bid protest, North Wind argued that Navarro's failure to meet the BOE requirements of the RFP should have rendered it ineligible for award of the ECO contract. In the alternative, North Wind argued that Navarro's failure to meet the BOE requirements should have resulted in a score of zero for the technical approach subfactor of the mission suitability factor. In addition, North Wind raised arguments similar to those raised in its original protest to GAO—*i.e.*, that NASA's evaluation of the North Wind proposal was unreasonable and inconsistent with the terms of the RFP.

In its own bid protest, ERT raised the same arguments as North Wind with respect to Navarro's failure to meet the BOE requirements of the RFP. In addition, ERT argued that the source selection decision was also flawed because the SSA did not consider all of the proposals—including the proposal submitted by ERT—in her best-value tradeoff analysis.[11]

10. During the hearing before GAO, the SSA testified that she did not compare the original source selection statement with the new one, and she further stated that she was unaware that the SEB had discovered a new strength in the Navarro proposal that was not apparent during the initial evaluation. *See* AR 11340–42. The SSA also testified that she did not review either the RFP or the offerors' proposals. AR 11339, 11357, 11359, 11372.

11. Navarro moved to dismiss the North Wind protest on August 9, 2011, *see* AR Tab 86, and moved to dismiss the ERT protest the next day, *see* AR Tab 95. In its motion to dismiss the North Wind protest, Navarro argued that North Wind had not established that it had been prejudiced by the alleged procurement errors and therefore lacked standing to file its bid protest. With respect to the ERT protest, Navarro argued

On September 8, 2011, North Wind filed a supplemental protest with GAO based on information contained in the agency report submitted by NASA. *See* AR Tab 87. Most relevant to the issues now before the court, North Wind argued that the evaluation of the Navarro proposal was flawed in three respects. First, North Wind challenged NASA's assertion that statements found within the fifty pages of Navarro's mission suitability proposal satisfied the BOE requirements of the RFP. Next, North Wind challenged NASA's assertion that the integrated-evaluation clause of the RFP allowed NASA to consider information contained outside of the mission suitability volume—*i.e.*, information set forth in other volumes of the proposal—to determine whether Navarro met the BOE requirements. Finally, North Wind challenged NASA's assertion that Navarro could meet the BOE requirements by simply adopting the IGE as its BOE.

Following a one-day combined hearing on the protests on October 18, 2011, *see* AR Tab 99, and after accepting post-hearing briefing from the parties, *see* AR Tabs 100–03, GAO sustained the protests on November 4, 2011, *see* AR Tab 104.

GAO rejected the argument advanced by NASA and Navarro that the protestors were not "interested parties" for the purpose of establishing prejudice. GAO acknowledged that North Wind was assigned the [ ] rating on the mission suitability factor and had not successfully challenged the evaluation of its own proposal or those of the higher-ranked offerors. But GAO further held that NASA could have nonetheless selected North Wind for award as the best value to the government, particularly in light of its low evaluated price. GAO further held that ERT's failure to protest the initial contract award to Navarro did not preclude its protest of the second award. ERT was not, according to GAO, protesting NASA's corrective action;

rather, it was protesting what it alleged was a flawed source selection.

Next, GAO dismissed the argument that Navarro's adoption of the IGE obviated the need to meet the BOE requirements described in Section L of the RFP, and noted that the contracting officer, NASA's principal witness, had admitted as much during his testimony. GAO further stated that Navarro's adoption of the IGE was not expressed anywhere within its fifty-page mission suitability volume. In other words, according to GAO, even if the adoption of the IGE were sufficient to meet the BOE requirements, Navarro did not adopt the IGE within the page limits established by the RFP.

GAO also found that Navarro's resource tables were inconsistent with the IGE and thus undermined NASA's conclusion that Navarro had clearly adopted the IGE in its mission suitability volume. GAO compared the FTEs set forth in the resource tables attached to the mission suitability volume and determined that they did not match some of the FTEs contained in the IGE.

GAO also reviewed some of the purported examples of BOE narrative contained in the mission suitability volume submitted by Navarro, but disagreed with NASA as to whether those examples satisfied the BOE requirements of the RFP.[12] For instance, GAO noted the absence of BOE narrative required to set forth supporting rationale for all labor resources (including FTEs and skill mix) proposed and an explanation of how the proposed FTEs were estimated. GAO also held that there was no narrative discussion demonstrating that Navarro understood the non-labor resources it had proposed, as required under the RFP. GAO concluded that many of the examples referenced by NASA and Navarro were nothing more than a restatement of the contract's requirements, and that the basis of the majority of FTEs and non-labor resources proposed by Navar-

---

that ERT did not possess standing because it did not participate in the original bid protest that culminated in NASA's corrective action. In addition, Navarro argued that at least one of ERT's arguments—*i.e.*, that NASA should have considered ERT in its best-value tradeoff analysis—was untimely.

**12.** GAO stated that it had considered all of the examples of BOE narrative identified by NASA and Navarro, but discussed only a selection of those examples in its decision. AR 11607 n. 12.

ro was not explained in the mission suitability volume.

Finally, GAO rejected the assertion that the integrated-evaluation clause of the RFP allowed NASA to pull language from other parts of the Navarro proposal for the purpose of meeting the BOE requirements inasmuch as those requirements had to be located within the fifty-page mission suitability volume. GAO noted that the contracting officer testified that the purpose of that clause was to corroborate and validate the consistency and integration of the information contained in different parts of the offerors' proposals. GAO held that, in contrast, "instead of merely corroborating and validating, NASA used such information—not contained in the mission suitability proposal—to backfill Navarro's response to the BOE requirements." AR 11608 (footnote omitted). Such use of the integrated-evaluation clause, according to GAO, circumvented the clear page limitations of the RFP. While acknowledging that NASA downgraded Navarro's technical score due to the failure to expressly adopt the IGE in its mission suitability volume, GAO held that "NASA's willingness to essentially waive the BOE requirement for Navarro, without disclosing this willingness to all of the offerors and providing them an opportunity to submit revised proposals, was prejudicial to the offerors who provided the required BOEs within the page limitation imposed on the mission suitability proposals." AR 11608. In short, according to GAO, the challenged procurement violated the fundamental principle that "offerors must be treated equally and be provided with a common basis for the preparation of their proposals." AR 11609 (citing *Elec. Design, Inc.*, B–279662.2, B–279662.3, B–279662.4, 98–2 CPD ¶ 69, 1998 WL 600991 (Comp.Gen. Aug. 31, 1998)).

On January 20, 2012, NASA informed GAO of its decision to implement the recommended corrective action, *see* AR 11646, and it sent an e-mail to Navarro on January 23, 2012, proposing a no-cost termination for convenience, AR 11648. Under its proposed corrective action, NASA intends to, *inter alia*, appoint a new SSA and SEB, amend the RFP to increase or remove the page limit for the mission suitability volume, solicit revised proposals based on the amended RFP, and issue a new source selection decision. AR 11647.

## II. Procedural History

Navarro filed its bid protest complaint in this court on January 30, 2012. With its complaint, Navarro also filed a motion for a temporary restraining order and a motion for a preliminary injunction, along with a memorandum in support of those motions. The next day, North Wind and ERT filed motions to intervene in this matter, and the court granted both of those motions. In accordance with the scheduling order in this case, the government filed the administrative record on February 10, 2012. Because defendant agreed to wait until the court resolves this protest on the merits before issuing an amended solicitation for the subject contract, the court denied Navarro's motions for a temporary restraining order and for a preliminary injunction as moot.

Navarro filed its motion for judgment on the administrative record and a supporting memorandum on February 28, 2012. Defendant and intervenors filed their respective cross-motions for judgment on the administrative record and responses to Navarro's motion for judgment on March 20, 2012. Navarro filed its reply in support of its motion for judgment, as well as its response to defendant's and intervenors' respective cross-motions for judgment, on April 13, 2012. Defendant and intervenors filed their replies in support of their cross-motions for judgment on the administrative record on April 27, 2012. The court heard oral argument from the parties on May 8, 2012.

## DISCUSSION

### I. Bid Protest Jurisdiction

▮ This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

28 U.S.C. § 1491(b)(1) (2006). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.2003) (*ITAC* ); *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1369 (Fed.Cir.2002).

## II. Standard of Review for Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356–57 (Fed.Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

## III. Bid Protest Review

 The court first examines whether the plaintiff in a bid protest has standing to bring the suit. *ITAC,* 316 F.3d at 1319. Standing arises from prejudice, which is present if the plaintiff establishes that it is an interested party with a direct economic interest in the procurement. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) (*AFGE* )). Bid protest standing is limited to those plaintiffs who are " 'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.' " *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed.Cir.2009) (quoting *AFGE,* 258 F.3d at 1302). In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a "non-trivial competitive injury which

can be addressed by judicial relief." [13] *Id.* at 1362.

 As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [ (2006) ]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Banknote Corp. of Am. v. United States,* 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1085–86 (Fed.Cir.2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed.Cir.2001) (*Impresa* )). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States,* 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)).

 In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g., Ala. Aircraft Indus., Inc.-Birmingham v. United States,* 586 F.3d 1372, 1376 (Fed.Cir.2009) (reversing this court when it "substitut[ed] … the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Instead, the court must "determine whether the agency's … analysis [of propos-

---

**13.** This court has held that a challenge by a contract awardee to an agency's decision to terminate the awarded contract and to take corrective action involving the solicitation of revised

proposals is in the nature of a pre-award protest. *See, e.g., Sheridan Corp. v. United States,* 95 Fed. Cl. 141, 148–49 (2010).

als] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* at 1375–76 (citation omitted). The court will "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts,* 216 F.3d at 1058 (citation omitted).

 " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum,* 404 F.3d at 1351.

 When an agency terminates or otherwise rescinds an awarded contract, or proposes to do so, in accordance with a corrective action plan recommended by GAO, the contractor may challenge the agency's decision to follow the GAO recommendation under the general legal standards applicable to all bid protests. In other words, the contractor must demonstrate that the agency's decision to move forward with the corrective action was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. The Federal Circuit has held that an agency's decision to take corrective action will be deemed irrational only when it implements an irrational GAO decision. *Turner Constr. Co. v. United States,* 645 F.3d 1377, 1383 (Fed.Cir.2011) ("[W]e have stated that an agency's decision lacks a rational basis if it implements a GAO recommendation that is itself irrational.") (citations omitted); *Honeywell,* 870 F.2d at 648 ("In these circumstances, a procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational.").

## IV. Standing

 Only a protestor who has suffered or will suffer a non-trivial competitive injury that can be redressed by judicial relief has a direct economic interest in the procurement and standing before this court. *Weeks Marine,* 575 F.3d at 1362. Neither NASA nor the intervenors challenge Navarro's standing to bring this protest. Here, Navarro was an actual bidder, *see* AR Tab 30, and was the successful offeror and contract awardee not once, but twice, *see* AR Tabs 19, 28, 48, 50. Navarro's proposal received the highest score on the most important technical evaluation factor, AR 8569, and it received a higher rating for past performance than all but one of the other offerors, AR 8620. Navarro's proposal has been twice selected as the best value to the government, AR 1782, 8744, and it is now facing the loss of the ECO contract for the second time, AR 8524, 11648. There is no question that Navarro has standing to bring this bid protest.

## V. Analysis of Navarro's Claims in this Protest

The protestor in this case—Navarro—was the successful offeror in the procurement for the subject contract and was ultimately awarded that contract. The intervenors in this case—North Wind and ERT—protested that award to GAO, which ultimately sustained their protests. When a disappointed bidder files a protest in this court following an unsuccessful protest to GAO, the court essentially ignores that earlier protest. But when a contract awardee files a protest in this court challenging a corrective action recommended by GAO pursuant to a successful protest by a disappointed bidder, this court must review the rationality of the GAO decision because it is the only basis upon which to evaluate the rationality of the procuring agency's decision to proceed with the recommended corrective action. *See Grunley Walsh Int'l, LLC v. United States,* 78 Fed.Cl. 35, 44 (2007) ("In order to review an agency's action when it is based upon the recommendation of the GAO, it is necessary to examine the underlying decision of the GAO.") (citation omitted). And, as noted above, the

court must uphold the agency's corrective action unless it was based upon an irrational GAO decision. *See, e.g., Honeywell,* 870 F.2d at 648.

Here, the court need not address—at least not directly—the rationality or legality of the contract award to Navarro. Nor is the court required—or allowed—to determine whether, in its opinion, GAO reached the correct decision in sustaining the bid protests challenging that award. Rather, the sole issue before this court is whether the GAO decision was irrational. For the reasons set forth below, the court holds that it was not.

### A. GAO's Conclusion that the RFP Required Offerors to Provide the Requisite BOE Narrative within the Fifty–Page Mission Suitability Volume Was Not Irrational

 In sustaining the protests of North Wind and ERT, GAO determined that the RFP required each offeror to provide the requisite BOE narrative within the limits of its fifty-page mission suitability volume. GAO's determination in that regard was not only reasonable, it is fully supported by the language of the RFP and now appears to be undisputed by the parties. Nonetheless, because the issue is central to GAO's decision, and because Navarro has taken what might be viewed as inconsistent positions on the issue, the court will address it here.

In its motion for judgment, Navarro states that "GAO was requiring an unstated level of perfection" when it held that the RFP required offerors to express their BOE within the fifty-page mission suitability volume. Pl.'s Mot. at 22 n. 11. During oral argument before this court, however, counsel for Navarro conceded that offerors were required to meet the BOE requirement within the fifty-page mission suitability volume. Oral Argument Transcript (Tr.) at 13. Thus, Navarro has adopted inconsistent positions with respect to whether the RFP required offerors to set forth their BOE within the mission suitability volume. Fortunately, the court need not determine where Navarro actually stands on this issue because the language of the RFP is clear, and there was nothing unreasonable about GAO's interpretation of

that language. In its decision, GAO read the RFP to require each offeror to set forth its BOE narrative within the confines of its fifty-page mission suitability volume. The court holds that GAO's determination in that regard was reasonable and was supported by the clear language of the RFP.

As discussed above, the technical approach subfactor consisted of two parts: (1) overall technical approach; and (2) specific technical understanding and resources. AR 1148–49, 1240. For the second of those two parts, offerors were required to provide three levels of detail for each of the three sample task orders in the RFP: (1) a discussion demonstrating the offeror's specific technical understanding of the requirements; (2) the BOE, including any efficiencies or cost savings; and (3) the labor resources and indirect costs proposed, in the form of resource tables. AR 1149–50. The RFP stated that the offerors' submission for this part of the technical approach subfactor must include a narrative and the required resource tables, AR 1149, and required that the BOE be part of the narrative discussion and not be contained within the resource tables, AR 1151 (explaining that the resource tables "shall agree with the narrative discussion in paragraphs A and B above").

The RFP provided that certain portions of the mission suitability volume would not be counted against the fifty-page limit. For example, the RFP noted that "[t]itle pages, tables of contents, and acronym listings are excluded from the page counts specified in paragraph (a) of this provision." AR 1134. In addition, the RFP stated that the resource sheets for the specific technical understanding and resources subfactor, as well as the safety and health plan for the safety and health approach subfactor, would not be counted against the fifty-page limit. AR 1145. But the RFP is clear that the narrative portion of the offerors' responses to the specific technical understanding and resources subfactor, which included the BOE, was subject to the fifty-page limitation. AR 1145.

During the hearing on the GAO protests, moreover, the contracting officer testified that the BOE was a requirement of the RFP,

AR 11486, and that offerors were required to provide the requisite BOE narrative within the fifty-page mission suitability volume, AR 11445–49. Counsel for NASA also stipulated that the RFP required offerors to provide their BOE narrative within the mission suitability volume of their proposals. AR 11371. In short, even during the earlier protest, there was no disagreement between NASA and GAO with respect to whether offerors were required to include their BOE narrative within the page-limited mission suitability volume, and Navarro appears to have abandoned its challenge to that interpretation of the RFP. See Tr. at 13. Thus, GAO's interpretation of the BOE requirement was not irrational.

### B. GAO's Conclusion that Navarro Did Not Provide the Requisite BOE Narrative within the Fifty–Page Mission Suitability Volume Was Not Irrational

■ The Navarro proposal included a fifty-page mission suitability volume, plus a supplement containing fifty-six pages of BOE narrative and three pages of resource tables. See AR 2667–2779. Following the removal of Navarro's BOE attachment, NASA nonetheless determined that there was other language contained within Navarro's proposal (both within and outside of the mission suitability volume) that could be characterized and accepted as BOE narrative.[14] In contrast, GAO concluded that Navarro did not provide the mandatory BOE narrative within the fifty pages of its mission suitability volume, as required by the RFP. The court holds that GAO's conclusion was not unreasonable. In fact, the issue now appears to be undisputed by the parties.

Under the RFP, the resource tables were excluded from the page-count limitation for the mission suitability volume, but the required BOE narrative was not. AR 1145, 1148–51. It appears that Navarro misread the RFP and believed that the BOE narrative and the resource tables were both excluded from the fifty-page limit for the mission suitability volume. Indeed, the Navarro proposal states that because the required BOE narrative and resource tables "are outside of the page count, they are included with this volume in another tab and referred to in each of the sample tasks." AR 2681. The table of contents for the mission suitability volume in the Navarro proposal states that the required BOEs are located at pages 14, 26, and 33, AR 2668–69, but none of the identified pages contains the BOE narrative required by the RFP. Instead, those pages simply reference the fifty-six pages of BOE narrative that had been appended to the mission suitability volume. See AR 2685, 2696, 2703 (noting that the required BOEs are attached to the proposal).

In its motion for judgment, Navarro asserts that it satisfied the BOE narrative requirements within its fifty-page mission suitability volume. See Pl.'s Mot. at 7 ("Navarro's mission suitability proposal provides the requisite BOE in narrative form."), 9 ("Navarro provided this narrative explaining the rationale for its BOE in the 50 pages of its mission suitability proposal."). During oral argument, in contrast, counsel for Navarro conceded that his client did not provide the required BOE narrative—particularly, a supporting rationale for all labor resources proposed—within its fifty-page mission suitability volume. Tr. at 13–14, 19. In fact, he stated that his client "failed to express anything about the BOE" in that volume, Tr. at 13–14, and had simply made a "mistake" in failing to provide the required information, Tr. at 13.[15]

---

**14.** During its re-evaluation of the Navarro proposal, the SEB appeared to assume—as Navarro now argues—that the adoption of the IGE was *sufficient to meet the BOE requirement, and it* assigned a weakness to the proposal because Navarro had failed to do that expressly in its mission suitability volume. *See* AR 9651–52. The SEB's evaluation materials do not suggest that Navarro had satisfied the specific BOE narrative requirements—such as providing an explanation of its proposed FTEs and skill mix—within its mission suitability volume. In fact, the

evaluation sheet for the weakness assigned to the Navarro proposal states that no detailed narrative was required in Navarro's mission suitability volume because it had adopted the IGE. During the GAO bid protest, however, NASA identified twenty-four statements from Navarro's proposal that it asserted satisfied those requirements. *See* AR 9459–64, 10928–32.

**15.** In its motion for judgment, Navarro argues that GAO irrationally dismissed the importance of the table of contents for its proposal, which

Following the first GAO protest, NASA elected to re-evaluate the Navarro proposal without the fifty-six pages of BOE narrative attached to the mission suitability volume. Notwithstanding the clear statements within the Navarro proposal indicating that the mandatory BOE narrative was located outside of the fifty pages of the mission suitability volume, NASA scoured those pages in an attempt to identify language that could be characterized as BOE narrative. GAO concluded that NASA's efforts in that regard were ultimately unsuccessful, noting that the statements culled from the Navarro proposal may or may not have been consistent with NASA's determination that Navarro had intended to adopt the IGE, but did not in any event meet the BOE requirements as set forth in the RFP.

During the GAO protest, NASA identified twenty-four examples of what it claimed was BOE narrative contained within the Navarro proposal, twenty of which were within the fifty-page limit of the mission suitability volume. *See* AR 10928–32. GAO concluded that the language identified by NASA did not meet the BOE requirements set forth in the RFP, and that many of the examples referenced by NASA were nothing more than restatements of the work required under the sample task orders. Those examples, according to GAO, did not set forth the "supporting rationale for all labor resources (FTEs and skill mix) proposed." Nor, according to GAO, did those examples explain how the proposed FTEs were estimated.[16] Finally, GAO concluded that Navarro had also failed to include a discussion demonstrating that it understood its proposed non-labor resources.

GAO's conclusion that Navarro failed to meet the BOE requirements within its fifty-page mission suitability volume was not irrational. In its motion, Navarro argues that GAO substituted its own judgment for that of the agency when it determined that the examples cited by NASA did not satisfy the BOE narrative requirements. According to Navarro, it was within the sole discretion of the agency to determine whether the BOE narrative was sufficient to demonstrate that the proposed resources are realistic for the proposed technical and management approach. It is true that the RFP required the offerors' BOE to "[i]nclude sufficient narrative discussion to convince the Government that the proposed resources are realistic for the proposed technical and management approach." AR 1150. While the fulfillment of this particular requirement may have been susceptible to a more discretionary or subjective evaluation by NASA, there were other BOE narrative requirements identified by GAO, and mentioned above, that Navarro simply failed to provide. Those three GAO examples were requirements of BOE narra-

stated that the required BOE narrative was contained within the fifty pages of its mission suitability volume. *See* Pl.'s Mot. at 27 ("GAO offers no reasonable, objective evidence for disregarding Navarro's table of contents for the mission suitability proposal which indicated that Navarro's BOE was located within the fifty-page limit."). But the references to the BOE in the table of contents point to pages that merely reference the BOE attachment that was excised from the Navarro proposal. *See* AR 2685, 2696, 2703. Navarro states in its motion for judgment that it did in fact set forth its BOE narrative within the mission suitability volume, and that GAO's contrary finding suggests that "GAO could not have possibly conducted a detailed review of Navarro's fifty-page mission suitability proposal." Pl.'s Mot. at 27 n. 16. In light of Navarro's sharp reversal as to whether it provided the requisite BOE narrative within the fifty-page mission suitability volume, it appears that it was Navarro—rather than GAO—that failed to review its own proposal to determine whether the required BOE narrative was actually there.

**16.** Navarro points to statements made by counsel for North Wind and ERT during the GAO hearing in which they stated that they were "satisfied" with the examples of BOE narrative cited by NASA. Pl.'s Reply at 9. In context, however, it is quite clear that counsel for intervenors were not stating that those examples satisfied the BOE requirements of the RFP; rather, they were simply expressing their view that it was unnecessary to read each of those examples into the record during the hearing because they were contained in NASA's submissions to GAO and were thus already a part of the record in that protest. *See* AR 11412 (stating that the protestors were satisfied with examples purporting to demonstrate that NASA conducted an integrated evaluation of the offerors' proposals), 11418 (stating that the protestors were satisfied with examples purporting to demonstrate that Navarro intended to adopt the IGE). North Wind provided a response to each of those examples in its post-hearing briefing. *See* AR 11569–78.

tive which had been completely omitted by plaintiff and, therefore, were not subject to any level of discretionary evaluation by the agency. Thus, it was the unassailable omission of those requirements upon which GAO based its determination that Navarro's proposal failed to meet the overall BOE narrative requirements. *See* AR 11607.

As noted above, the RFP required each offeror to "[e]xplain the BOE by providing supporting rationale for all labor resources (FTEs and skill mix) proposed." AR 1150. GAO acknowledged that some of the examples referenced by NASA might be read to contain a supporting rationale for *some* of the labor resources proposed by Navarro. *See* AR 11607 n. 14. But it concluded that Navarro had not set forth a supporting rationale for *all* of the labor resources proposed as required under the RFP. The court agrees: the mission suitability volume in Navarro's proposal does not set forth a supporting rationale for all of the labor resources contained in its resource tables, and Navarro does not claim otherwise. In fact, counsel for Navarro conceded during oral argument that Navarro failed to meet that BOE requirement within its fifty-page mission suitability volume. Tr. at 19 ("[W]e did not provide all rationale in support of our BOE for each particular labor category. You could walk through our 50 pages and find some examples where we cited to information that demonstrated we were going to base our BOE on the IGE and narrative in support of that, but only some examples. We didn't go through it all.").

In addition, the RFP also required that each offeror "[i]nclude a discussion regarding how the proposed FTEs were estimated." AR 1150. Once again, while some of the examples cited by NASA might be viewed as a discussion of how *some* of the FTEs set forth in Navarro's resource sheets were estimated, there is no question that those examples do not cover *all* of the labor resources proposed. Finally, the RFP also required a "narrative BOE ... that depicts the offeror's understanding of the required non-labor resources[,]" AR 1150, and GAO held that Navarro failed to meet that requirement as well, AR 11607. Navarro, for its part, has not

argued that it met either of those requirements. Instead, Navarro now argues that the adoption of the IGE was sufficient to meet the BOE narrative requirement, and that the use of the integrated-evaluation clause enabled NASA to determine that Navarro intended to adopt the IGE. For several reasons discussed in detail below, those arguments are unavailing.

In short, the court holds that GAO's determination that Navarro did not set forth the required BOE narrative within its fifty-page mission suitability volume was not unreasonable. The record wholly supports GAO's decision, and while Navarro challenged that determination in its motion for judgment on the administrative record, it has now abandoned that challenge by conceding that it did not meet the BOE requirements within the fifty pages of its mission suitability volume. *See* Tr. at 13 (stating that Navarro "failed to express anything about the BOE [in its mission suitability volume]").

**C. GAO's Conclusion that an Offeror's Adoption of the IGE Does Not Relieve that Offeror of the Obligation to Provide the Requisite BOE Narrative within Its Fifty–Page Mission Suitability Volume Was Not Irrational**

 In response to GAO's finding that the Navarro proposal did not set forth the required BOE narrative within its fifty-page mission suitability volume, Navarro argues that it was not required to meet the BOE narrative requirements, or that it should have been held to a lower standard in that regard because it adopted the IGE in its proposal. Or, put another way, Navarro argues that a statement adopting the IGE is the only narrative that is necessary to meet the BOE requirements. Those arguments fail for a number of reasons.

Navarro first argues that the adoption of the IGE, without more, is sufficient to meet the BOE requirements. *See* Tr. at 12–13, 26–27. Despite Navarro's contention in that regard, plaintiff fails to cleanly clear even the first hurdle of actually adopting the IGE. Navarro concedes that its mission suitability volume contains no express adoption of the

IGE. *See* Pl.'s Mot. at 9 ("Admittedly, Navarro's mission suitability proposal does not expressly identify the IGE as its BOE as requested by Section L of the RFP."). Indeed, the weakness assigned to the Navarro proposal for the technical approach subfactor was for its failure to expressly adopt the IGE in the mission suitability volume. Accordingly, even if the adoption of the IGE in that volume had been sufficient to meet the BOE requirement, it is undisputed that Navarro did not do that in this case. Instead, Navarro contends that NASA was able to divine its intention to adopt the IGE based upon the mere *consistency* of certain statements contained within the mission suitability volume with the IGE.[17]

Such an argument by Navarro is not, however, a sound one since, as GAO determined, there are a number of discrepancies between the Navarro proposal and the IGE. The Navarro resource table for the FFP task order allocates [ ] for Scientist 3 and [ ] for Engineer 3, AR 2721, while the IGE allocates a single FTE for the former and zero for the latter, AR 1157. As a result of those discrepancies, the total number of FTEs proposed by Navarro for that task order does not equal the number of FTEs set forth in the IGE. Similarly, the Navarro resource table for the first CPFF task order allocates [ ] for IT 3 and [ ] for Technician 1, AR 2734, while the IGE allocates no FTEs for IT 3 and three FTEs for Technician 1, AR 1157.

Based on those discrepancies, the total number of FTEs set forth in the Navarro resource table for that task order is not equal to the number of FTEs in the IGE. Accordingly, even if the adoption of the IGE were sufficient to meet the BOE requirement, and even if the mere consistency of the resources proposed in the mission suitability volume and those set forth in the IGE were sufficient to effect an adoption of the IGE, the Navarro proposal and the IGE are simply inconsistent.[18]

In any event, the contracting officer testified before GAO that an offeror's mere adoption of the IGE does not relieve that offeror of its obligation to meet the BOE requirement within the mission suitability volume. *See* AR 11448 (explaining that an offeror adopting the IGE must do so expressly and must also "state why they deemed the IGE was appropriate and adequate").[19] In other words, the argument now advanced by Navarro was expressly disclaimed by NASA during the proceedings before GAO. For that reason, the argument that GAO substituted its own interpretation of the RFP for NASA's is simply untenable.

Navarro also argues that the BOE requirement applies only to those offerors who elect to deviate from the IGE. In support of that argument, Navarro points to two isolated statements within the RFP. Navarro notes that the RFP instructs that "[o]fferors are

17. Navarro also notes that it expressly adopted the IGE in its staffing plan. As discussed above, however, each offeror was required to set forth the mandatory BOE narrative within the fifty pages of its mission suitability volume. The staffing plan was outside of both the mission suitability volume as well as its page limit.

18. During the hearing before GAO, counsel for North Wind also questioned the contracting officer about discrepancies between the dollar amounts allocated for non-labor resources on the Navarro resource tables and in the IGE for each of the three task orders. *See* AR 11461–63. Counsel for North Wind also brought the contracting officer's attention to a discrepancy between the number of FTEs and skill mix set forth on an organizational chart in the Navarro proposal and those presented in the IGE. *See* AR 11455–56. While the existence of those additional discrepancies is supported by the record, the issue was not discussed in GAO's decision and need not be addressed at length here.

19. During the course of oral argument, Navarro changed its position at least twice with respect to the issue of whether an express adoption of the IGE, without more, was sufficient to meet the BOE requirement. Initially, Navarro argued that an adoption of the IGE was all that was needed to meet the BOE requirement. Tr. at 12–13. When pressed by the court, however, Navarro conceded that an offeror must state that it is adopting the IGE and must also provide narrative in support of that adoption. Tr. at 13–14. Later during the argument, however, Navarro appeared to return to its original position, *i.e.,* that an express adoption of the IGE, without more, is sufficient to meet the BOE requirement. Tr. at 27 (stating that a single sentence indicating that Navarro had elected to adopt the IGE was all that was necessary to meet the BOE requirement).

free to incorporate the IGE into their Cost/Price Volume[,]" *see* AR 1160, and thus describes the adoption of the IGE as "the standard measure for BOE narrative" for non-labor resources, Pl.'s Mot. at 6. Next, Navarro notes that offerors who choose not to adopt the IGE are required to provide additional documentation in support of their non-labor resource allocations. Pl.'s Mot. at 6. Based on those two provisions, Navarro appears to assert that offerors who adopt the IGE are exempt from the requirement to include a BOE narrative in the mission suitability volume. *See* Pl.'s Mot. at 5–6 ("Thus, the obvious intent of the Government is to use an offeror's BOE to evaluate whether 'the proposed resources are realistic for the proposed technical and management approach' *in the absence of an offeror relying upon the IGE.*") (emphasis added). Navarro's reliance on those provisions is misplaced.

The RFP states that offerors may adopt the IGE for non-labor resources in their cost volume; it does not state that they may adopt that IGE—or the separate IGE for labor resources—in lieu of the required BOE narrative in their mission suitability volume, nor does it suggest that an offeror's adoption of the IGE in Volume III of its proposal somehow waives the wholly separate requirements applicable to Volume I. In addition, while offerors who elect to deviate from the IGE for non-labor resources are required to submit additional documentation in support of their non-labor resource allocations, those documentation requirements are separate and distinct from the BOE narrative requirements of the RFP. *Compare* AR 1150 *with* AR 1160. Indeed, the RFP expressly states that a "narrative BOE shall be provided that depicts the offeror's understanding of the required non-labor resources." AR 1150.

Navarro also advances a more plausible—yet ultimately unpersuasive—argument that an offeror who adopts the IGE should face a lower burden with respect to the BOE requirements than an offeror who deviates substantially from the IGE. *See* Pl.'s Mot. at 28 ("NASA's scrutiny of [Navarro's intent to

adopt the IGE] would logically be less strict than its scrutiny of an offeror who proposed its own estimate of labor and skill levels to meet the requirements of the task orders."). To be sure, an offeror who adopts the IGE might not need to provide the same level of detail in its BOE narrative—as compared with an offeror who deviates significantly from the IGE—for the purpose of convincing the government that the resources proposed by that offeror are realistic and feasible. But other elements of the mandatory BOE narrative would not depend on whether a particular offeror has elected to adopt the IGE. For example, the BOE narrative must always include a supporting rationale for all of the labor resources proposed and a discussion of how those proposed resources were estimated, regardless of whether the offeror has adopted the IGE. As discussed above, Navarro has conceded that its proposal does not meet those requirements. *See* Tr. at 13–14, 19.

In the end, however, it is irrelevant whether Navarro intended to adopt the IGE in its mission suitability volume, and it is equally irrelevant whether Navarro expressly stated its intent to do so.[20] An adoption of the IGE does not waive the BOE requirements set forth in Section L of the RFP. Nothing in the RFP expressly states that offerors may adopt the IGE in lieu of meeting the BOE narrative requirements, and there are several statements that contradict such a contention. *See, e.g.,* AR 1160 (noting that the IGE is not a government "plug number"), 1159 (stating that the IGE is not intended to influence the offerors' proposals and emphasizing that "[o]fferors shall develop their own estimates that support their unique proposal management and technical approaches *and shall provide supporting rationale in narrative form* ") (emphasis added). Navarro was required to provide the BOE narrative mandated by the RFP within its fifty-page mission suitability volume, and it failed to do so. GAO was not irrational in concluding that an offeror that adopts the IGE, or expresses an intent to do so, is still required to meet the BOE requirements.

---

20. Based on its staffing plan and the excised BOE attachment, it is clear that Navarro did intend to adopt the IGE for both labor and non-

labor resources. As discussed above, however, that does not meet the BOE requirements, nor does it excuse Navarro from those requirements.

D. **GAO's Conclusion that the Integrated–Evaluation Clause of the RFP Does Not Allow Offerors to Circumvent the Requirement to Provide BOE Narrative within the Fifty–Page Mission Suitability Proposal Was Not Irrational**

 The RFP states that "[a]lthough proposals are organized by factors and subfactors, the Government will conduct an integrated evaluation, considering any proposal data in its evaluation of each factor and subfactor." AR 1239. Accordingly, "all aspects of the offeror's proposal will be considered during the evaluation process, including the offeror's proposed Model Contract." AR 1239. Navarro argues that this integrated-evaluation clause allowed NASA to identify information contained in other volumes of the Navarro proposal for the purpose of meeting the BOE requirement. GAO disagreed with that interpretation of the integrated-evaluation clause, holding that the purpose of the clause was to allow NASA to corroborate and validate the consistency and integration of the various portions of the offerors' proposals. In sustaining the protests, GAO determined that rather than "merely corroborating and validating, NASA used such information—not contained in the mission suitability proposal—to backfill Navarro's response to the BOE requirements." AR 11608 (footnote omitted).

The court again notes that the RFP required offerors to set forth the required BOE narrative within the mission suitability volume of their proposals. The RFP imposed a fifty-page limit on that volume, and explained that the narrative portion of the offerors' responses to the requirements of the technical approach subfactor, including the BOE narrative, was counted against that page limitation. The RFP also warned offerors, in two different sections, that "[p]ages submitted in excess of the limitations specified in this provision will not be evaluated by the Government and will be returned to the offeror." AR 1135, 1239.

Notwithstanding the page limitations set forth in the RFP, Navarro argues that "[t]o the extent GAO maintains that the RFP required NASA to look only to Navarro's mission suitability proposal (which contained a fifty-page limit) to evaluate Navarro's BOE, that position directly contravenes the plain language of the integrated assessment clause of the RFP and is contrary to settled GAO precedent requiring that solicitation requirements be read as a whole." Pl.'s Mot. at 22 (footnote omitted). This court holds, to the contrary, that GAO's reading of the integrated-evaluation clause was reasonable and fully consistent with the other terms of the RFP, while the interpretation urged by Navarro is unreasonable because it is inconsistent with the page limit for the mission suitability volume.

During the hearing before GAO, the contracting officer testified that the purpose of the integrated-evaluation clause was to ensure that the different parts of a proposal were consistent with one another, i.e., that information contained in the mission suitability volume was consistent with and carried forward to the other volumes, such as the cost volume and the model contract. *See* AR 11393–94. The contracting officer also noted that an integrated evaluation of proposals prevents an offeror from "gaming" the procurement system by proposing something in its mission suitability volume that is not reflected in the cost volume and model contract. AR 11394. The contracting officer did not state, however, that the integrated-evaluation clause could be used to meet the BOE requirements of the RFP; in fact, he stated that the BOE narrative must be contained within the fifty pages of the mission suitability volume. *See* AR 11445–49. Counsel for NASA also stipulated to that reading of the RFP. AR 11371.

GAO adopted the interpretation of the integrated-evaluation clause expressed by the contracting officer. This interpretation is consistent with the page limit for the mission suitability volume. Under that reading of the clause, offerors were required to set forth the mandatory BOE narrative within the main body of the fifty-page mission suitability volume, and NASA was required to review the other parts of the proposal only to ensure that the information presented in the mission suitability volume was consistent with them.

In contrast, the interpretation of the integrated-evaluation clause advanced by Navarro eviscerates the clear page limitations set forth in Section L of the RFP. Under Navarro's interpretation of the clause, offerors would be free to circumvent the page limits by attaching their BOE narrative—or any other information that was required to be within one of the page-limited volumes—to a section of the proposal with more generous page limits. Indeed, under its interpretation, Navarro could have appended its entire fifty-six-page BOE attachment to Volume III (Cost and Price), which did not have a page under the RFP.

[20] Navarro cites several GAO decisions and one treatise for the proposition that agencies are allowed to conduct integrated evaluations of proposals. But those decisions do not support Navarro's claims here, because there is no dispute among the parties as to whether NASA was allowed to review the various parts of the offerors' proposals under the integrated-evaluation clause of the RFP. Rather, the issue is the proper scope and application of that clause. In this case, GAO properly determined that the purpose of the integrated-evaluation clause is to allow the procuring agency to ensure that different parts of a proposal are *consistent* with one another. Similarly, the treatise referenced by Navarro notes that information in one volume of a proposal can properly affect the evaluation of another volume, and that "[fail-ure to *correlate* the information in the segments of an offeror's proposal can lead to an irrational evaluation or at least to a poor selection of the source." John Cibinic, Jr. et al., *Formation of Government Contracts* at 946 (4th ed. 2011) (emphasis added). Here, NASA did not merely "correlate" information in Navarro's mission suitability volume with information contained in other parts of its proposal; instead, NASA sought to cherry pick information from those other parts to backfill and meet RFP requirements that had to be satisfied within the fifty-page limit of the mission suitability volume.

In *Excalibur Laundries, Inc.*, B–405814, B–405814.2, 2012 CPD ¶ 1, 2012 WL 112380 (Comp.Gen. Jan. 3, 2012), the principal case cited by Navarro in support of its interpretation of the integrated-evaluation clause, GAO held that an agency was free to look to information in the past performance section of an offeror's proposal for the purpose of determining whether that offeror was technically acceptable under the relevant experience factor of the evaluation. GAO explained that "[w]e see no solicitation provision—and Excalibur has cited to none—that would have precluded the agency from considering information in the past performance section of an offeror's proposal for purposes of evaluating the offeror's technical acceptability under the relevant experience factor." *Id.* at *3. Here, in contrast, there is a clear RFP provision—*i.e.*, the page limit for the mission suitability volume—that effectively precludes the use of information outside of the mission suitability volume to meet requirements that must be satisfied in that volume. None of the cases cited by Navarro endorses the use of an integrated-evaluation clause to thwart the other requirements of a solicitation.

The government and intervenors argue that Navarro's BOE narrative had to have been contained within its mission suitability volume, and that any information drawn from other sections of its proposal had to have been counted against the page limit for that volume.[21] The contracting officer testified before GAO that the SEB did not count the BOE material contained in other parts of the Navarro proposal, particularly its express adoption of the IGE in the staffing plan, against the page limitation for the mission suitability volume. AR 11451. Because the mission suitability volume of the Navarro proposal already contained fifty pages, any reliance by NASA upon information outside of those pages to meet the BOE requirement was a violation of the RFP.

In its motion for judgment on the administrative record, and during oral argument, Navarro asserts that NASA did not use information from outside of the mission suita-

---

21. With respect to the cost volume of an offeror's proposal, the RFP states that "[i]nformation that can be construed as belonging in one of the other sections of the proposal will be so construed and counted against that section's page limitation." AR 1134.

bility volume to conclude that Navarro had satisfied the BOE requirement. Instead, according to Navarro, NASA determined that Navarro did not meet the BOE narrative requirement, assigned Navarro a weakness for that reason, and relied on materials outside of the first volume of its proposal for the limited purpose of assessing the severity of that weakness. There are at least two problems with that argument. First, it contradicts the argument advanced by Navarro before GAO. *Compare* AR 11593 ("NASA did not rely on anything outside of Navarro's 50–page Technical Approach to evaluate the weakness that it assigned to Navarro.") *with* Pl.'s Mot. at 26 ("NASA issued Navarro a 'weakness' for the omission, but merely looked outside the page limit to judge the severity of the issue.").

More importantly, Navarro's characterization of the nature of NASA's evaluation is not supported by the administrative record. In the evaluation sheet for the weakness assigned to the Navarro proposal, the SEB stated that its review of the resource tables, management plan, and cost volume "was necessary in order to conclude that the offeror fully understood the task order requirements and that their approach was effective and feasible." AR 9651. The RFP states that the mission suitability volume of an offeror's proposal must contain "sufficient narrative discussion to convince the Government that the proposed resources are realistic for the proposed technical and management approach." AR 1150. Similarly, the evaluation sheet states that the mission suitability volume of the Navarro proposal did not expressly adopt the IGE and "simply did not explain this approach, although several areas of the proposal clearly indicate Navarro's intent to simply accept the IGE as their FTE and non-labor resources BOE." AR 9651.

In sum, the RFP required that offerors set forth the mandatory BOE narrative within the fifty-page mission suitability volume, the contracting officer confirmed that requirement in his testimony, and counsel for NASA stipulated to that reading of the BOE requirement. However, the administrative record demonstrates that the SEB reached outside of the mission suitability volume to locate information to meet the BOE requirement, in contravention of the requirement that the BOE narrative be contained in that volume, and contrary to the clear page limits set forth in the RFP. NASA's use of the integrated-evaluation clause in that manner effectively read the page limits out of the RFP for Navarro, and GAO was not irrational in holding that such a use of the integrated-evaluation clause was improper.

**E. GAO's Conclusion that NASA Failed to Treat the Offerors on an Equal Basis Was Not Irrational**

■ Navarro states that GAO substituted its own judgment for that of NASA in holding that the deduction of fifty-five points from Navarro's score on the mission suitability factor and the one-level downgrade of Navarro's technical approach rating was an unreasonable response to Navarro's failure to meet the BOE requirements of the RFP. In Navarro's view, that determination was tantamount to a conclusion that Navarro should have been assigned a more severe penalty or should have been rendered ineligible for contract award, and thus represented nothing more than a subjective disagreement with NASA on a matter committed to agency discretion. Navarro misunderstands the basis of GAO's decision.

Contrary to Navarro's assertion, GAO did not hold that Navarro should have been assigned a significant weakness, a deficiency, or any other penalty instead of a weakness, nor did it assert that Navarro should have been removed from the competition for the ECO contract. Rather, GAO determined that the manner in which NASA had conducted the procurement was fundamentally flawed because it failed to treat all offerors on a fair and equal basis:

In summary, while we note that NASA downgraded Navarro's proposal because it did not specifically state that it was adopting the agency's IGE as its BOE, NASA's willingness to essentially waive the BOE requirement for Navarro, without disclosing this willingness to all of the offerors and providing them an opportunity to submit revised proposals, was prejudicial to the offerors who provided the required

BOEs within the page limitation imposed on the mission suitability proposals. In this regard, it is a fundamental principle of government procurement that competition must be conducted on an equal basis; that is, offerors must be treated equally and be provided with a common basis for the preparation of their proposals.

AR 11608–09 (citations omitted).

Navarro notes that the BOE requirement was just one of three separate requirements used to evaluate one of two parts of the technical approach subfactor, which was one of three subfactors under the mission suitability factor, which was just one of three evaluation factors set forth in the RFP. Accordingly, Navarro argues that the BOE was an insignificant requirement of the RFP, and that the assigned weakness and fifty-five point deduction from Navarro's mission suitability score constituted a reasonable response to its absence. Pl.'s Mot. at 25 n. 14. Navarro seriously underestimates the impact of the BOE requirement in this procurement.

The BOE requirement of the RFP affected all of the offerors' proposals, and the consequence of Navarro's failure to meet that requirement—juxtaposed with the other offerors' strict compliance with the requirement—had an impact on the procurement that was much more substantial than Navarro suggests. The RFP warned that the information required to be contained in an offeror's proposal was "considered essential for the Government to conduct a fair and uniform evaluation of proposals in accordance with the evaluation factors and sub-factors provided in Section M." AR 1143. That warning proved to be quite prescient in this case.

The SEB assigned North Wind three significant weaknesses and an exceedingly low numeric score on the technical approach subfactor because it determined that North Wind's BOE was insufficient. In order to meet the page limits set forth in the RFP, North Wind limited its BOE narrative to approximately one and one-half pages for each of the three sample task orders.[22] *See* AR 4185–86, 4194–95, 4200–01. In each of

those short narratives, North Wind addressed the BOE requirements set forth in section L of the RFP, such as a rationale for all FTEs and skill mix proposed, any major assumptions, schedule and critical path, non-labor resources, efficiencies, and cost savings. Given the amount of information that North Wind was required to convey in such a limited amount of space, it is not surprising that the SEB found North Wind's BOE narrative to be "unsubstantiated," "ineffective," and "insufficient." *See* AR 1437, 1439, 1441.

In contrast, Navarro used fifty-six pages to address the same requirements that North Wind covered in fewer than five. *See* AR 2722–33, 2735–60, 2762–79. One of the significant strengths originally assigned to the Navarro proposal by the SEB for the technical approach subfactor was based entirely on the BOE attachment, AR 1487–88, and it is clear that the other significant strength for that subfactor was at least influenced by that attachment, AR 1485–86. In light of the substantial amount of required information that was contained in the BOE attachment—supporting rationale for labor resources, estimation of proposed FTEs, assumptions, discussion of non-labor resources, cost savings, and efficiencies, etc.—one would expect that the impact of its removal would be severe. Instead, the SEB removed just one of the significant strengths and replaced it with a new strength, modified the evaluation sheet for the remaining significant strength to omit any references to the BOE attachment, and assigned a single weakness for Navarro's failure to expressly adopt the IGE in the mission suitability volume. Then, the SEB informed the SSA that the only defect in the Navarro proposal was its failure to include a single sentence—an express adoption of the IGE—in the mission suitability volume. *See* AR 11329, 11347–49, 11374.

NASA ignored Navarro's failure to meet several requirements of the RFP. Navarro now concedes that it did not set forth a supporting narrative rationale for all of its proposed FTEs or for its proposed skill mix within its fifty-page mission suitability vol-

---

**22.** ERT devoted approximately the same number of pages to its required BOE narrative. *See* AR

3497–98, 3506–07, 3517–18.

ume. And the administrative record demonstrates that Navarro did not discuss how its proposed FTEs were estimated, nor did Navarro provide a discussion demonstrating that it understood the proposed non-labor resources.[23] None of those serious omissions formed the basis of the weakness assigned to Navarro on the technical approach subfactor; instead, that lone weakness was for Navarro's failure to expressly adopt the IGE in its mission suitability volume, and the court has held that such an adoption would not have satisfied the BOE requirement in any event. The SEB then noted that Navarro was not required to provide a detailed BOE narrative because it had adopted the IGE. AR 9651–52. In light of the foregoing, GAO was not unreasonable in finding that NASA had "essentially waive[d] the BOE requirement for Navarro, without disclosing this willingness to all of the offerors and providing them an opportunity to submit revised proposals...." AR 11608.

GAO has held that offerors are not treated on a fair and equal basis when they are not held to the same proposal preparation requirements, including page limitations. *Electronic Design*, 1998 WL 600991, at *7 ("It is a fundamental principle of government procurement that competition must be conducted on an equal basis; that is, offerors must be treated equally and be provided with a common basis for the preparation of their proposals.") (citations omitted); *Macfadden*

& *Assocs., Inc.*, B–275502, 97–1 CPD ¶ 88, 1997 WL 82099, at *2 (Comp.Gen. Feb. 27, 1997) ("Where an appendix included with a proposal causes the proposal to exceed a page limit established in the RFP, it would be improper for the agency to consider the appendix because to do so would confer upon the offeror furnishing the appendix a competitive advantage over those offerors whose proposals complied with the page limit.") (citation omitted); *ITT Electron Tech. Div.*, B–242289, 91–1 CPD ¶ 383, 1991 WL 86976, at *7 (Comp.Gen. Apr. 18, 1991) ("Offerors are obligated to establish the relative suitability of their proposals within RFP format limitations such as those applicable to the number of pages in a proposal, and if they do not, they are not entitled to further consideration. This constitutes unequal treatment; accordingly, we conclude that the agency acted improperly in considering the additional material and increasing the [awardee's] score based upon this material.") (citation omitted). GAO's decision in this case was not unreasonable, was supported by the administrative record and the language of the RFP, and was consistent with its precedent—a precedent to which, the court notes, GAO has continued to adhere. *See Digicon Corp.*, B–406184, B–406184.2, B–406184.5, 2012 CPD ¶ 105, 2012 WL 937391, at *7 (Comp.Gen. Mar. 5, 2012) ("[A]llowing the protester to satisfy the technical understanding and capability factor requirements by reference to other parts of its

---

**23.** In addition to the BOE narrative requirements noted above, the RFP also required that each offeror "[i]nclude a discussion associated with any assumptions made regarding the requirements that led to the proposed resources...." AR 1150. During the hearing on the GAO protest, the contracting officer stated that such a discussion was required only when a proposal was based upon assumptions, AR 11447, and that the Navarro proposal did not contain any assumptions, AR 11501. The single weakness assigned to the Navarro proposal likewise states that the proposal did not contain any assumptions and, for that reason, the SEB concluded that a detailed BOE narrative was not required. *See* AR 9651–52. The BOE attachment removed from the Navarro proposal, however, demonstrates that the proposal was based on dozens of specific assumptions, and it appears that none of those assumptions was even mentioned in the truncated proposal that remained following the removal of the attachment. *See, e.g.,* AR 2729 ("Navarro is assuming the Databas-

es are up-to-date at the time of transition and functional without fatal errors."), 2766 ("[ ]."). GAO did not address the omission of Navarro's assumptions in its decision, and the court's determination that GAO's decision was reasonable is not based on that omission by Navarro. Nonetheless, the court notes that it would have been nearly impossible for the SEB to conduct a proper evaluation of the Navarro proposal in light of those missing assumptions. If the SEB ignored the information contained in the BOE attachment and concluded that the Navarro proposal contained no assumptions, as the contracting officer testified, then its evaluation was based on inaccurate information. On the other hand, if the SEB considered Navarro's assumptions in its evaluation, then it improperly based its evaluation on information that had been removed from the Navarro proposal under the initial corrective action. In either case, the SEB's evaluation of Navarro's proposal would have been fundamentally flawed.

proposal would improperly increase the number of pages permitted for addressing company experience, without allowing other offerors the same opportunity.") (citations omitted).

### F. GAO's Conclusion that the Protests of North Wind and ERT Were Timely Was Not Irrational

■■■ Navarro further argues that the GAO decision sustaining the North Wind and ERT protests was irrational because those protests should have been dismissed as untimely. In that regard, Navarro argues that the protests should have been filed with GAO before the closing date for the submission of bids because those protests challenge a patent term of the RFP, *i.e.*, the integrated-evaluation clause. GAO's bid protest regulations state in relevant part that "[p]rotests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals." 4 C.F.R. § 21.2(a)(1) (2012). The court notes, at the outset, that whether a protest to GAO was timely filed is irrelevant to the separate issue of whether the GAO decision recommending corrective action was rational, *see Jacobs Tech. Inc. v. United States*, 100 Fed.Cl. 186, 197 (2011), and Navarro concedes that point, Tr. at 36.[24] Nonetheless, the court holds that the GAO protests were timely.

North Wind and ERT now argue—as they argued before GAO—that their protests did not challenge the integrated-evaluation clause of the RFP, but the agency's unreasonable interpretation of that clause to reach beyond the mission suitability volume for material to satisfy the BOE requirements. As discussed above, GAO's interpretation of the integrated-evaluation clause was reasonable, and NASA's contrary—and unreasonable—interpretation of the clause was by no means apparent on the face of the RFP. The protestors could not have been aware of the manner in which NASA ultimately interpreted that clause until they were finally afforded an opportunity to review the source selection decision or the underlying evaluation materials, which revealed NASA's unconventional use of the clause. Because the basis of the protests filed by North Wind and ERT was not apparent on the face of the RFP, those protests were properly filed post-award.

### G. GAO's Conclusion that North Wind and ERT Were Prejudiced by the ■■■■■ Evaluation of Navarro's Proposal Was Not Irrational

[23] Finally, Navarro argues that the GAO decision was irrational because neither North Wind nor ERT established that they suffered any prejudice as a result of the alleged procurement errors committed by NASA. In that regard, Navarro argues that North Wind was not in line for contract award because there were other offerors with higher mission suitability scores, and North Wind failed to successfully challenge the evaluation of its own proposal or those of the higher-ranked offerors. Navarro also argues that ERT was not prejudiced by the alleged errors in the procurement for the ECO contract, asserting that the technical superiority of the Navarro proposal was virtually insurmountable because Navarro outdistanced ERT on almost every stated evaluation factor, and the SEB assigned many more significant strengths to Navarro than to ERT.[25]

Under the Competition in Contracting Act, 31 U.S.C. § 3553(a) (2006) (CICA), standing to file a bid protest with GAO is limited to interested parties; *see also* 4 C.F.R. § 21.1(a) (2012) ("An interested party may protest ... an award or proposed award of ... a contract[.]"). CICA defines the term

---

24. During oral argument, counsel for Navarro conceded that whether a protest to GAO was timely filed or whether the GAO protestor was prejudiced by the alleged procurement errors is irrelevant to the only issue properly before the court in this type of bid protest: whether the GAO decision sustaining the protest was rational. Tr. at 36.

25. Before GAO, Navarro argued that ERT did not have standing because it did not protest the original contract award to Navarro and did not participate in the earlier protest filed by North Wind. *See* AR 11278–80. Navarro has not raised that argument here.

"interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract[.]" 31 U.S.C. § 3551(2)(A) (2006); *see also* 4 C.F.R. § 21.0(a)(1) ("*Interested party* means an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by the failure to award a contract.") (emphasis in original).

Much like its arguments predicated on the timeliness of the GAO protests, Navarro's arguments based on whether the protestors were prejudiced by NASA's alleged procurement errors are irrelevant to the rationality of GAO's decision to sustain the protests. *See Jacobs Technology*, 100 Fed.Cl. at 197. Nonetheless, the court holds that GAO reasonably determined that both North Wind and ERT were prejudiced by the procurement errors alleged in their protests.

Navarro asserts that "logic dictates that there are only two possible ways that [North Wind] could establish that it had a 'substantial chance' of receiving the award and thereby establishing competitive prejudice." Pl.'s Mot. at 33. First, according to Navarro, North Wind could have challenged the SEB's evaluation of its own mission suitability volume. Or, Navarro continues, North Wind could have challenged the SEB's evaluations of the other offerors with higher mission suitability scores. Because North Wind did neither, Navarro asserts that it is "logically impossible" for North Wind to establish competitive prejudice. Pl.'s Mot. at 34. Navarro's logic is faulty.

Navarro appears to assume that NASA must award the ECO contract to the offeror who achieves the highest numeric score on the mission suitability factor. While mission suitability is the most important evaluation factor under the RFP, *see* AR 1244, NASA was not required to award the contract to the offeror with the highest technical score, but was instead required to award the ECO contract to the offeror proposing that which the agency viewed as the best value to the government, based on both price and non-price factors. *See* 48 C.F.R. § 15.101–1 (2011). Indeed, the RFP expressly states that "the

highest technically rated proposals may not necessarily receive an award." AR 1238. It would not have been unreasonable for NASA to award the contract to North Wind, as long as NASA explained why the lower evaluated cost of that proposal justified its selection over technically superior proposals. Similarly, it would not have been unreasonable for NASA to award the contract to ERT, particularly given its high technical rating, which was second only to Navarro's. There was nothing unreasonable about GAO's determination that North Wind and ERT were both prejudiced by the procurement errors alleged in their protests.

### H. The Corrective Action Recommended by GAO, and Adopted by NASA, Was Not Irrational

 In addition to arguing that the GAO decision sustaining the protests was irrational, Navarro also contends that the corrective action recommended in this case—particularly the suggestion that NASA appoint a new SEB and SSA—was unreasonable. For the reasons discussed below, the court disagrees.

In response to the first GAO protest, NASA elected to re-evaluate the Navarro proposal without the offending fifty-six-page BOE attachment, but informed GAO that the re-evaluation would be conducted by the same SEB and SSA that had performed the initial evaluation. Because it did not believe that the SEB and SSA would be unaffected by or able to purge from their memories the information contained in the excised pages, North Wind objected to the proposed corrective action. Noting that agencies are entitled to substantial discretion in implementing a corrective action plan, GAO dismissed North Wind's objection, but further stated that "[i]f after the agency completes its re-evaluation of Navarro's proposal, and makes a new source selection, North Wind believes that the award was improper, it may protest the award and re-raise this objection of the re-evaluation." AR 8522 n. 1.

The administrative record seems to bear out North Wind's prediction that the SEB would be unable to conduct a fair re-evaluation of the Navarro proposal following the removal of the BOE attachment. It might

appear that during the re-evaluation the SEB searched through the remaining pages of the Navarro proposal to identify information sufficient to support an award of the subject contract to the offeror it believed, based largely on information contained in the excised BOE attachment, provided the best value to the government.

In its decision, GAO did not explain why the appointment of a new SEB and a new SSA was a reasonable means of fixing the errors in the procurement. In this case, however, the agency has expressed its own rationale for the appointment of a new SEB and a new SSA:

> The Agency takes it[s] fundamental duty to treat offerors impartially, fairly, and equitably very seriously. The Agency believes the [SEB] and [SSA] were put in the untenable position to validate their own work. The Agency further believes to protect the integrity of the acquisition process mandates that the Agency eliminate any issue that key source evaluation board participants were in any way predisposed to obtain or validate a particular decision. Therefore, to remove any appearance of impropriety, the Agency will follow and implement the GAO's recommendation.

AR 11645.

Given the particular circumstances of this case, the court concludes that the corrective action adopted by NASA, and the agency's rationale for adopting that corrective action, were reasonable. *See NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir. 1986) (holding that the contracting officer enjoys substantial discretion in adopting corrective action—even corrective action as severe as removing an offeror from a competition—to address the mere appearance of impropriety); *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 203 (1990) (describing the "contracting officer's broad discretion to oversee the procurement process and to protect its integrity from the appearance of impropriety"). While the solicitation of revised proposals from the offerors and the evaluation of those proposals by the same SEB and SSA might adequately address the procurement errors here, the availability of an alternative corrective action plan does not render the plan adopted by NASA unreasonable.

## CONCLUSION

In summary, the court concludes that the GAO decision was not irrational, and that NASA's decision to adopt the corrective action recommended in that decision was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Because Navarro's claims fail on the merits, the court need not address its related request for a permanent injunction. Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed February 28, 2012, is **DENIED;**

(2) Defendant's and Intervenor–Defendants' Cross–Motions for Judgment on the Administrative Record, filed March 20, 2012, are **GRANTED;**

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendants, **DISMISSING** the complaint, with prejudice;

(4) On or before **June 15, 2012,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5) Each party shall bear its own costs.